[Not for Publication]

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| EDWARD BIZZARRO, RICHARD, WRIGHT, and APRIL WEDDING, Individually and on Behalf of a Class of Others Similarly Situated, | : : : : : : | |
| Plaintiffs, | : : | Civil Action No. 07-5665 (FLW) |
| v. | : : | **OPINION** |
| OCEAN COUNTY, et al., | : : | |
| Defendants. | : : | |

---

**WOLFSON, United States District Judge:**

Plaintiffs April Wedding, Richard Wright, and Edward Bizzarro (collectively "Plaintiffs") initiated this putative class action to seek redress for allegedly being subjected to unlawful strip searches as pretrial detainees charged with non-indictable offenses while in the custody of the Ocean County Correctional Facility ("Ocean County Jail"). The Defendants are Ocean County Sheriff's Department, Ocean County Department of Corrections, Theodore J. Hutler, Jr., both individually and in his official capacity as the Warden of the Ocean County Correctional Facility, and Sandra Mueller, Chief of Corrections of the Ocean County Jail (collectively "Defendants"). Essentially, Plaintiffs allege that the members of the proposed class, arrested for non-indictable offenses, such as failure to pay child support and traffic fines, were illegally and unconstitutionally required to undress for inspection in violation of their right to privacy under the United States and New Jersey Constitutions. Presently before the Court is Plaintiffs' Motion to Certify the Class pursuant to Fed.R.Civ.P. 23(b)(3), or alternatively, 23(b)(2). The parties

appeared before the Court on June 2, 2009 for oral argument and in a conference in chambers reached agreement on several issues.  Further, the parties participated in a conference call with the Court on June 9, 2009.  Based on the representations and agreements of the parties and for the reasons stated herein, the Court grants Plaintiffs' Motion, as modified herein.

## I.      Procedural History

On November 28, 2007, Plaintiffs Jose Garcia, Wesley K. Bell, Edward Bizzarro, and Richard Wright (collectively "Original Plaintiffs") filed this action against Defendants.  On January 11, 2008, Original Plaintiffs filed an Amended Complaint against Defendants.  On January 14, 2008, April Wedding was added as a plaintiff.  By Order, dated June 5, 2008, Plaintiffs Jose Garcia and Wesley Bell (deceased) were dismissed from the action.  Plaintiffs filed their Second Amended Complaint ("Complaint") against Defendants on September 15, 2008.  On October 18, 2008, Plaintiffs filed the instant motion to Certify Class.  This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.  For the reasons stated herein, the Court grants the motion and certifies the class, as limited by the parties, under 23(b)(3); the Plaintiffs concede that their request for injunctive relief is moot, as Defendants have adopted a written policy with respect to the changing of inmates, that they no longer seek injunctive relief at this juncture, and have agreed to narrow the class period, to beginning on November 28, 2005 and extending to December 28, 2007.  The Court directs Plaintiffs to file a Third Amended Complaint consistent with the Court's ruling, i.e. the class as defined within the time period and reflecting the modified request for relief, within twenty (20) days.

## II.    Background

### A.    Facts Relating to Plaintiffs' Arrests, Detentions, and Alleged Strip Searches

#### 1.    April Wedding's Testimony

In August 2007, while driving her car, April Wedding was pulled over for a moving violation by a Little Egg Harbor police officer.  Elmer Robert Keach, III, Aff. (Keach Aff.), Ex. E, April Wedding Dep. ("Wedding Dep."), July 25, 2008, 5:21-22, 6:14-18.  Although Ms. Wedding did not recall why the officer pulled her over, after she provided her licence, registration and insurance card, the officer told her that she had an outstanding warrant for failure to pay a traffic fine of $431.  Id. 8:4-20, 12:18-23.  The officer arrested Ms. Wedding because she was delinquent in paying a ticket she received for careless driving, N.J.S.A. 39:4-97, which is not an indictable offense.  Id. 5:14-6:13.  When Ms. Wedding was transported to the Ocean County Jail, she was escorted to the booking desk and gave personal information to the booking officer. After she told the officer that she could not make bail, she was allegedly strip searched.[1]  Compl. ¶ 8; Wedding Dep. 22:12-14.

A female officer took Ms. Wedding to the shower room located adjacent to the booking desk and semi-closed the curtain – separating this room from the booking area – behind the two of them.  Wedding Dep. 16:25-17:11, 18:9-10.  The officer directed Ms. Wedding to take off her jewelry, including her earrings, lip ring, and tongue ring.  Id. 18:17-19:10.  Then, the officer

---

[1]New Jersey law defines a strip search as "the removal or rearrangement of clothing for the purpose of visual inspection of the person's undergarments, buttocks, anus, genitals or breasts." N.J.S.A. § 2A:161A-3.  However, this definition is not binding on the Court for the purpose of determining the constitutionality of an alleged strip search.  See Florence v. Bd. of Chosen Freeholders of the County of Burlington, No. 05-3619, 2008 WL 800970, at *1, n. 2 (D.N.J. Mar. 20, 2008).

instructed Ms. Wedding to take off all of her clothes, including her undergarments.  Id. 19:6-16.

From about three feet away, the officer inspected Ms. Wedding's clothes and gave her back her

underwear, but not her bra, which had a wire in it, and thus, was not permitted inside the facility.

Id. 19:17-14.  While nude, the officer told Ms. Wedding to turn around, bend over, then squat

and cough, and she was also asked to lift her breasts.  Id. 19:15-18, 21:1-2.  At some point during

this search, the officer also checked Ms. Wedding's mouth.  Id. 19:19-25.  After Plaintiff

complied with all of the officer's requests, she was permitted to put on her underwear and the

prison uniform.  Id. 23:17-24:1.  The officer never physically touched Ms. Wedding during this

changing process, which lasted about five minutes.  Id. 21:3-12, 23:12-16.[2]  Ms. Wedding was

held at the Ocean Jail for two days and was released when her mother posted bail for her.  Id.

27:21-28:9, 29:9-22, 30:13-31:2.  Ms. Wedding also testified that although she had never

previously been in a jail cell, she thought she had been detained in a holding room in Little Egg

Harbor, Tuckerton, Stafford, and Barnegat based on other traffic violations.  Id. 34:7-36:10.

### 2.    Richard Wright's Testimony

On October 1, 2007, Richard Wright ("Mr. Wright") turned himself in to "detectives" in

Toms River for failure to pay child support.  Keach Aff., Ex. F, Richard Wright Dep. ("Wright

Dep."), July 25, 2008, 6:18-19, 7:8-11.  Mr. Wright testified that the warrant for his arrest, issued

on September 12, 2007, stated that he owed $5,129.58.  Id. 8:4-10.  Mr. Wright was taken to the

Ocean County Jail, where he was escorted through the basement sally-port entrance to the

booking area.  Id.  8:21-23, 9:23-10:12.  There he provided information to the booking officer

---

[2]Ms. Wedding testified that she was not given or does not remember receiving a
delousing agent; it is unclear if she understood the question, but she did state that she "didn't get
any lice stuff or anything else."  Id. 21:7-12, 22:20-23:11.

and told him that he was planning on posting the $100 bail.  Id. 10:24-11:14.  Mr. Wright testified that he was not permitted to make a phone call until after he was changed.  Id. 12:20-25.

A male officer brought Mr. Wright to "the changing room," which was adjacent to the booking area and consisted of a shower and a sink area.  Id. 13:3-20, 16:12-14.  Mr. Wright testified that although the doorway to the changing room had a curtain on it, the curtain remained open during his entire changing process.  Id. 13:21-14:3.  The officer directed Mr. Wright to remove all of his clothes, including his underwear, id. 14:6-15, and the officer checked his clothes.  As directed, Mr. Wright opened his mouth, and lifted his tongue.  Id. 14:16-18, 15:17-20.  The officer instructed Mr. Wright to "lift [his] scrotum sacs," then "turn around, put [his] hands on the wall and then [he] was told to lift [his] feet in the air, one at a time and then [he] was told to spread his buttocks."  Id. 16:2-3, 15-20.  As Mr. Wright complied with all of the officer's instructions, the officer remained in close proximity, observing him.  Id. 15:21-16:1.  Thereafter, Mr. Wright was permitted to put on the prison uniform and slippers.  Id. 17:14-22.

Then, Mr. Wright was permitted to call his girlfriend, who brought the money to the child support collection office in Toms River the same day.  Id. 11:15-12:10, 19:18-20:4.  Approximately twelve hours after Mr. Wright's arrest, he made bail and was released.  Id. 20:22-21:8.  Prior to this arrest, Mr. Wright estimated that he had been in the Ocean County Jail times for offenses, such as failure to pay child support and resisting arrest.  Id. 23:21-24:18.  Mr. Wright served eleven months in jail in 2005 or 2006 for resisting arrest.  Id.  25:17-22, 26:5-6.

### 3.    Edward Bizzarro's Testimony

After work on September 6, 2007, Edward Bizzarro ("Mr. Bizzarro") was arrested at his home by several Ocean County sheriffs for failure to pay child support.  Affirmation of Elmer

Robert Keach, III, Ex. G, Edward Bizzarro Dep. ("Bizzarro Dep."), September 23, 2008, 10:20-11:7, 29:2-12, 30:8-10.  Mr. Bizzarro was taken to the booking area at the Ocean County Jail , id. 16:13-17:6, where he waited on a bench for about a half hour before he was taken to the changing room.  Id. 18:11-23.  Mr. Bizzarro testified that he was taken to change before he provided his personal information to the booking officer.  Id. 18:24-19:11.

Mr. Bizzarro described the changing room as an area separate from the booking area with a shower stall and a curtain.  Id. 18:24-19:17.  Mr. Bizzarro was directed to stand against the wall, remove all of his clothes, including his underwear, lift his genitals so his "private area" could be checked, then bend over, spread his cheeks, and cough so the officer could check his "anal area" and look up his rectum.  Id. 20:21-21:11, 22:6-10, 23:9-12.  As Mr. Bizzarro complied with the all of the officer's requests, the officer inspected him from about four feet away.  Id. 21:25-22:5.  The officer also instructed Mr. Bizzarro to lift his feet, id. 23:6-7, and open his mouth and the officer stepped closer to look inside.  Id. 22:11-19.  After the officer checked his clothes, id.  21:12-19, and finished the visual inspection, the officer gave Mr. Bizzarro back his underwear and provided him with a prison uniform to put on as well as a pair of flip-flops.  Id. 24:2-12.  After he put on the uniform, Mr. Bizzarro was given a property sheet to record the list of items the Ocean County Jail retained.  Id. 25:11-15.

Mr. Bizzarro again waited on the bench to be photographed before he was taken to a crowded holding cell.  Id.  26:18-28:2.  Mr. Bizzarro testified that he was held for a week on that offense before he was released, id. 32:7-16,[3] and may have been incarcerated in the Ocean

---

[3]Although there is some indication that Judge Francis R. Hodgson signed an Ocean County Superior Court, Probation Division, Child Support, Release Amount Order for Mr. Bizzarro on September 7, 2007 stating the Mr. Bizzarro needed to pay $300 to probation by

6

County Jail 100 times for failure to pay child support.  Id. 8:5-13.

### B.        Evidence in the Record: Ocean County Jail's Procedures

The parties attached several documents and deposition transcripts relating to Defendants' intake policies and procedures to their moving papers.  The Court will briefly summarize some of this evidence as it relates directly to Plaintiffs' class action allegations.

The Ocean County Department of Corrections Policy 9.03 titled "Physical Searches" contains Ocean County's inmate searching procedures.  Affirmation of Elmer Robert Keach, III, Ex. D.  Section 9.03-.04 states that "[a] person who has been detained or arrested for commission of an offense other than a crime and who is confined in this facility shall not be subject to a strip search unless there is reasonable suspicion that a weapon, controlled dangerous substance, or contraband will be found."  Further, this section states that "[i]f there is reasonable suspicion, this suspicion must be documented prior to the strip search taking place."  Policy Searches, Section 9.03A.  In addition, before the search is conducted, it must be "approved by the Officer-in-Charge."  Id.  If these criteria are not met, the prisoner should only be visually observed in their undergarments.  Id.

Similarly, the New Jersey Administrative Code 10A:31-8.4 states that "[a] person who has been detained or arrested for commission of an offense other than a crime and who is confined in an adult correctional facility shall not be subject to a strip search unless there is reasonable suspicion that a weapon, controlled dangerous substance or contraband will be

---

Monday, September 10, 2007, Bizzarro Dep. 32:19-25, 37:1-10, 38:6-10, there is no such evidence in the current record before the Court.  Moreover, even if true, it is not relevant on this motion.

found."  In addition, N.J.A.C. 10A:31-8.5(b)(6) states that strip searches may be conducted "whenever the person admitted for a minor offense(s) is known to have a history of violent or assaultive conduct or a previous conviction(s) for a crime."[4]

Lieutenant Anthony Spina ("Lt. Spina"), who oversees booking and classification of inmates entering the Ocean County Jail, testified as a representative of Ocean County in accordance with Fed. R. Civ. P. 30(b)(6) in this case.  At the time he testified to the Ocean County Jail's procedures for newly admitted inmates, Lt. Spina had worked for Ocean County in the Department of Corrections for 23 years and 11 months.  Lieutenant Anthony Spina Dep. ("Lt. Spina Dep."), July 18, 2008, 101:16-19.  Lt. Spina explained that a newly admitted "prisoner is escorted up to the booking desk by a police officer and their paperwork is presented to one of the booking officers."  Id. 76:15-18.  The booking officer makes sure that the prisoner is mentally fit for incarceration, pats down the inmate, removes the restraints, and begins to process that person. Id.  76:20-77:2.  According to Lt. Spina, at that point, the prisoner is asked if he or she can post bail and are given an opportunity to do so before the inmate is required to change into the prison uniform, a process known as "changing the inmate".  Id. 77:3-17, 150:24-151:17.

Lt. Spina described the place where inmates change or strip as a changing area with a bench seat on the wall to the left and two showers on the right.  Id. 97:2-21.  This area is separated from the property room and the booking desk by a curtain.  Id.  Lt. Spina acknowledged that all pretrial detainees, irrespective of whether the arrestee was charged with an indictable or non-indictable offense, who are changed into the prison uniform, were required to

---

[4]According to Defendants, the Ocean County Jail policies mirror the New Jersey Administrative Code.

completely remove all of their clothing, including undergarments, while an officer had an opportunity to visually observe them.  Id. 152:1-153:1.  These inmates, regardless of whether reasonable suspicion existed, were brought into the changing area and instructed to remove all of their clothing for inspection.  Id. 136:1-12, 139:24-140:20.  According to Lt. Spina, an officer directs the inmate to first strip down to his or her undergarments, and then remove his underwear so that the officer may inspect the waistband for concealed objects.  Id. 139:7-141:1.  Similarly, a female inmate's brassiere is also inspected.  Id.  This disrobing procedure was conducted on all detainees without regard to any individual factors, id. 149:20-150:23, such as the inmate's charge, prior institutional history or criminal history, or whether there was any reason to believe that the inmate was concealing contraband.  Id. 152:11-153:1.

Lt. Spina drew a distinction between this visual observation conducted while changing the inmate, which is used for inmates arrested for non-indictable offenses, and more thorough strip searches, which are used when the charge is an indictable offense.  Lt. Spina stated that when changing the inmate, the officers were "not instructed to observe them or do an inspection of them, they are instructed to remove their clothing and issue them jail garb.  They are not instructed to do any kind of search of their naked body or anything like that."  Id. 144:1-17.[5]  On the other hand, inmates who are charged with indictable offenses are subjected to a full strip search, including a thorough search and visual inspection of body cavities, namely detainees must open their mouths, lift their arms, and manipulate their genitalia, bend down, squat, and cough for inspection of the genital and anal areas.  Id. 98:16-100:5.  Some inmates are even asked "to

---

[5]Defendants concede that "the corrections officer stays in the room and makes visual observations of the inmate's body, looking for scars, tattoos, signs of infection or infestation, etc." while the prisoner stands in his or her undergarments.  Df. Opp. at 9.

lift the penis separate from the testicles in order to inspect that area" during a thorough strip search.  Id. 99:15-100:5.

Lt. Spina admitted that there is no description of a strip search in Ocean County Jail's policy, that its written policy on strip searches is confusing, and that there has been no formal training, nor outlines or programs in place to train the officers about the requirements of these searches.  Id. 100:6-23, 235:7-236:16; Ex. D.  Further, the Physical Search policy requires that "any person received from any jurisdiction to be remanded to this institution . . . shall be strip searched before being sent to the housing floor or any designated housing."  Ex. D at 21-22; Lt. Spina Dep. 244:9-17.  Interestingly, Lt. Spina confirmed that both the strip searches and "clothing exchanges" occur in the same shower area, which is commonly referred to as the "strip search area or strip search room."  Lt. Spina Dep. 136:14-137:24.

Toward the end of 2007, after hearing that class action lawsuits were filed against other counties in New Jersey, id. 130:16-131:4, Lt. Spina recommended that Ocean County Jail install an opaque "privacy" curtain in one of the shower stalls in the changing area.  Id. 121:10-124:23, 126:17-24.  This curtain was added to one of the shower stalls by removing the full curtain used for showers and replacing it with a shorter curtain that enabled officers to see prisoners' heads and everything from their thighs down.  Id. 127:3-12.  Lt. Spina decided to install the curtain to "get away from the perception that the [non-indictable] inmates were being strip searched," id. 122:19-123:14, when they were not subject to the full strip search process, such as manipulating their genitals, lifting their breasts, bending down, spreading the cheeks of their butt and

10

coughing.  Id. 121:11-123:11.[6]  However, he said that he was not aware of any detainees who had

ever made complaints to corrections officers that they were strip searched.  Id. 123:12-24.  After

the curtain was installed, pretrial detainees, who were arrested for non-indictable offenses, were

no longer required to completely disrobe in front of a corrections officer of the same sex for

visual observation or inspection of his or her undergarments.  Rather, the inmate would be

afforded privacy behind the curtain while the officer could still monitor the inmate during the

clothing change.

In their Opposition, Defendants also included partial testimony from Officers Christopher

Larney, Jessica Clayton, and William Thompson to support their position that inmates arrested

for non-indictable offenses were not subjected to full strip searches.[7]  Moreover, Defendants

contend that the Ocean County Jail did not have a policy that officers direct inmates to remove

their undergarments during the changing process prior to the privacy curtain's installation in

November of 2007.  First, Defendants offer the testimony of Officer Chistopher Larney ("Ofc.

Larney").[8]  Ofc. Larney testified that inmates entering Ocean County Jail are classified based on

---

[6]Even though Lt. Spina testified that he was not sure exactly when the curtain was installed, Id. 121:10-122:15, both parties use November 2007 as the time when the curtain was installed.  Thus, for the purposes of this motion, the Court does the same.  In an effort to include all potential class members, the parties agree that the class should close on December 28, 2007, approximately one month after the curtain was installed.

[7]At this stage of the litigation, these factual inconsistencies with Plaintiffs' and Lt. Spina's testimony need not be addressed; although Defendants appear to dispute how the changing process was carried out through the testimony from these three officers, on the record before the Court, there is evidence of disrobing.  See Part III, infra.

[8]Mr. Bizzarro was unable to name the changing officer in his deposition; Defendants assert that the name of the changing officer – Officer Christopher Larney – is contained on the inmate's personal property record.  Df. Opp. at 6 n. 5.  This issue of whether Officer Larney was Mr. Bizzarro's changing officer need not be addressed on this motion and will not be further

11

their charge as temporarily confined ("TC") or non-indictable offenses, and lawfully confined or indictable offenses.  R. Scott Clayton Cert., Ex. A, Officer Christopher Larney Dep. ("Ofc. Larney Dep."), Sept. 23, 2008, 23:25-25:9.  Ofc. Larney testified that when he changes a TC inmate, he does not require the inmate to remove all of his clothing; instead, he has the inmate strip down to his underwear, and provides the inmate with a prison uniform.  Id. 48:3-49:24, 57:5-24.  He also testified that the TC inmates were afforded privacy in November 2007 when a partial curtain was installed and these inmates were permitted to stand behind the curtain when they changed into the prison uniforms.  Id. 70:3-9.

Second, Defendants offer the testimony from Officer Jessica Clayton ("Ofc. Clayton"). Ofc. Clayton described the changing area as a room – separated from the booking area by a full-length curtain in a doorway – that consists of two shower stalls, one used for showers and the other used for changing TC inmates.  R. Scott Clayton Cert., Ex. B, Officer Jessica Clayton Dep. ("Ofc. Clayton Dep."), Sept. 23, 2008, 47:2-48:16.  According to Officer Clayton, prior to the installation of the privacy curtain, a female prisoner went behind the main curtain with the changing officer and she had the choice to face the wall (away from the changing officer) and could keep her bra and underwear on, so her private areas were not exposed.  Id. 48:25-49:25. However, Ofc. Clayton stated that if the brassiere contained an underwire, it would be withheld or the wire would be removed prior to returning it to the inmate.  Id. 16:20-17:13.[9]  Since the curtain was added, the inmates "go behind a curtain, which is next to the one shower stall, and

---

addressed by the Court here.

[9]The Court notes that if the female inmate's bra had an underwire, then according to Ofc. Clayton's testimony, prior to the installation of the privacy curtain, the inmate would have to remove at least some of her undergarments.

they're instructed to hand out each piece of clothing.  It's inspected.  Whatever they are allowed

to keep is given back to them along with a uniform and a pair of shower shoes."  Id. 47:2-10.

Last, Defendants offer excerpts from the testimony of Officer William Thompson ("Ofc.

Thompson").  Ofc. Thompson testified that prior to the installation of the curtain in November

2007, he would direct a TC inmate to stand in the middle of the changing room and strip down to

his underwear.  R. Scott Clayton Cert., Ex. C, Officer William Thompson Dep. ("Ofc. Thompson

Dep."), Sept. 23, 2008, 30:4-14.  Since the curtain was installed, Ofc. Thompson directs TC

inmates to stand behind the curtain when changing into the prison uniform.  Id. 38:3-22.

### C.     Plaintiffs' Class Action Allegations

Plaintiffs claim that the procedures described in the preceding paragraphs, before the

installation of the partial curtain in November 2007, amount to strip searches even if the

procedures involve a so-called "visual observation" or even if the written policy facially

complied with New Jersey's strip searching rules.  Plaintiffs allege that Defendants "have

instituted a written and/or de facto policy, custom, or practice of strip searching all individuals

who enter the custody of the Ocean County Jail and are placed into jail clothing, regardless of the

nature of their charged crime and absent reasonable suspicion to believe that the individual was

concealing a weapon or contraband."  Compl. ¶ 32.  Thus, according to Plaintiffs, each member

of the class was the "victim of a routine strip search upon their entry into the Ocean County Jail."

Id. ¶ 38.  Moreover, Plaintiffs assert that these searches were conducted on individuals arrested

for non-indictable offenses without any inquiry into or establishment of reasonable suspicion.  Id.

Thus, Plaintiffs allege that the intake procedures violate the Fourth Amendment of the United

States Constitution, which is made applicable to the States through the Fourteenth Amendment,

and New Jersey law, N.J.S.A. 10:6-2(c).  Id. ¶¶ 25, 30, 55

Plaintiffs now move to certify their class action claim.  They define their proposed class

as follows:

> All persons who have been or will be placed into the custody of the Ocean County Jail
> after being charged with non-indictable offenses such as disorderly persons offenses,
> traffic infractions, and/or civil commitments and were strip searched upon their entry into
> the Ocean County Jail.  The class period commences on November 28, 2005 and extends
> to the date on which the Ocean County Sheriff's Department and/or the County of Ocean
> are enjoined from, or otherwise cease, enforcing their unconstitutional policy, practice
> and custom of conducting strip searches absent reasonable suspicion.  Specifically
> excluded from the class are Defendants and any and all of their respective affiliates, legal
> representatives, heirs, successors, employees or assignees.

Compl. ¶ 16.  Plaintiffs allege that there are hundreds of people – approximately 4,000 in the

proposed class – arrested for misdemeanors, traffic warrants, failure to pay child support, and

other violations, who were all unconstitutionally strip searched due to Defendants' policies and

procedures.  Id. ¶¶ 18, 20.  Plaintiffs further allege that Defendants conducted these strip searches

absent reasonable suspicion.  Id. ¶ 20.  Thus, Plaintiffs claim that "Defendants' written and/or de

facto policy of strip searching all individuals charged with misdemeanors or minor crimes and

committed to the Ocean County Jail is a violation of the Fourth and Fourteenth Amendment to

the United States Constitution" and the Constitution of New Jersey.  Id. ¶¶ 26, 55.  In their

Complaint, Plaintiffs seek declaratory and injunctive relief as well as money damages, Id. ¶¶ 24,

59; however, by way of a conference call with the Court on June 9, 2009, Plaintiffs conceded that

their request for injunctive relief is moot on this motion due to Defendants' written policy with

14

respect to the changing of inmates and no longer seek such relief.[10]

Defendants oppose the class certification because: "(1) there is a predominance of individual issues that precludes class certification; (2) the claims of the class representatives are not necessarily typical of the class, generally; (3) due to their atypical claims, the proposed class representatives cannot adequately represent the interests of the class; (4) the proposed class does not satisfy the requirements under Fed. R. Civ. P. 23(b), and (5) the class definition is overly broad under the circumstances presented in this case." Df. Opp. at 2. Defendants do not oppose the numerosity or commonality requirements. For the reasons stated herein, the Court grants Plaintiffs' motion and certifies the class under Rule 23(b)(3).


## III.    DISCUSSION

"To obtain class action certification, plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994). In considering whether certification is proper, courts refrain from inquiring into the merits of the action and accept the substantive allegations in the complaint as true. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1973). However, courts may need "to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied," Wilson v. County of Gloucester, — F. Supp. 2d —, 2009 WL 805179, at *3 (D.N.J. Mar. 30, 2009) (citations omitted), because "the class determination generally involves

---

[10]The parties, however, agree to continue to work on the language of Defendants' newly adopted policy going forward, and the necessity, if any, of a consent order being entered.

considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause

of action.'"  Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351

(1977) (citation omitted).  When certifying a class, a Court must make factual determinations

supporting Rule 23 findings by a preponderance of the evidence and resolve all factual or legal

disputes relevant to class certification, even if they overlap with the merits – including disputes

touching on elements of the cause of action.  In re: Hydrogen Peroxide Antitrust Litig., 552 F.3d

305, 307 (3d Cir. 2008).  "The interests of justice require that in a doubtful case . . . any error, if

there is to be one, should be committed in favor of allowing class certification."  Eisenberg v.

Gagnon, 766 F.2d 770, 785 (3d Cir. 1985).

     Federal Rule of Civil Procedure 23(a) provides a two-step requirement to certify a class

action.  First, Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of
> all members only if: (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of the claims or defenses of the class;
> and (4) the representative parties will fairly and adequately protect the interests of the
> class.

If the Plaintiffs satisfy Rule 23(a)'s prerequisites referred to as numerosity, commonality,

typicality, and adequacy of representation, see Gen. Telephone Co. Of the Sw. v. Falcon, 457

U.S. 147, 156 (1982), then the Court must determine if the class action is maintainable under any

of the three provisions in Rule 23(b).  As previously discussed, Plaintiffs seek certification under

Rule 23(b)(3) or, in the alternative, Rule 23(b)(2).

     A class may be certified under Rule 23(b)(3) if "the court finds that the questions of law

or fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  In In re: Hydrogen Peroxide Antitrust Litig., the Third Circuit emphasized that "[t]he twin requirements of Rule 23(b)(3) are known as predominance and superiority."  552 F.3d at 310.  A class may be certified under 23(b)(2) if "[t]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  In In re: Hydrogen Peroxide Antitrust Litig., the Third Circuit also stated that "[t]he trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23."  552 F.3d at 310.

The Court will first discuss Defendants' objections to the proposed class as overly broad, it will next consider each of Rule 23(a)'s elements in turn, and then determine whether a class can be maintained under Rule 23(b).

### A.      Propriety of the Proposed Class

As an initial matter, the Court addresses Defendants' three objections to the proposed class definition as overly broad.  First, Defendants argue that the proposed class includes members who were lawfully searched pursuant to a finding of reasonable suspicion and/ or pursuant to 10A:31-8.5(b)(6) because the individual had a history of violent criminal behavior, and/or multiple incarcerations.  Df. Opp. at 24.  This argument mirrors Defendants' argument against certification under Rule 23(a) because Plaintiffs claims are not typical of the proposed class, and thus, the Court addresses them herein.  See Part II.B.3., infra.

Second, Defendants contend that although the proposed class commences on November 28, 2005 and extends to the date on which the County of Ocean is enjoined from or otherwise ceases enforcing its allegedly unconstitutional policy and practice of conducting unlawful strip searches, the Ocean County Jail "ceased the alleged unconstitutional conduct in November 2007 when it installed the curtain in the clothing exchange room."  Df. Opp. at 24.  Based on the parties' representations, the Court finds that the installation of this curtain narrows the class period to those Plaintiffs, detained for non-indictable offenses, who were allegedly subjected to suspicionless searches pre-curtain installation.  Plaintiffs agree to narrow the class definition to:

> All persons who had been placed into the custody of the Ocean County Jail after being charged with non-indictable offenses such as disorderly persons offenses, traffic infractions, and/or civil commitments and were strip searched upon their entry into the Ocean County Jail.  The class period commences on November 28, 2005 and extends to December 28, 2007.  Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees or assignees.

In addition, Plaintiffs concede that they do not seek injunctive relief at this time.  The Court directs Plaintiffs to file their Third Amended Complaint consistent with these stipulations within twenty (20) days.  Further, as discussed herein, see Part II.B. & C., infra., based on the parties' papers and these representations, Plaintiffs satisfy the requirements of Rule 23, which is the inquiry on this motion.

Third, Defendants assert that the proposed class includes individuals who may not have been subjected to a strip search.  To support their position that at least some of the inmates arrested for non-indictable offenses were not subjected to full strip searches, Defendants offer the testimony of Ofcs. Larney, Clayton, and Thompson who claim that prior to the installation of the curtain, they did not require all of the non-indictable inmates to remove all of their clothing and

only instructed them to strip down to their undergarments.  Thus, Defendants argue that the Court should not have to go through the "grueling process of [determining the manner in which each individual claimant under the proposed class was booked,] deposing each individual, looking up that individual's records to determine whom the changing officer was, and taking the sworn testimony of that changing officer as a means of checking the veracity of the plaintiff[s'] claims." Df. Opp. at 25.

When certifying a class, a Court must make factual determinations supporting Rule 23 findings by a preponderance of the evidence and resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits-including disputes touching on elements of the cause of action.  In re: Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 307 (3d Cir. 2008).  Further, "[t[he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing class certification."  Eisenberg, 766 F.2d at 785.  In this case, notwithstanding the testimony of the named officers, the testimony of Defendants' Rule 30(b)(6) deponent Lt. Spina states that newly admitted inmates charged with non-indictable offenses were directed to remove all of their clothing during the clothing exchange.  Lt. Spina acknowledged that all pretrial detainees, irrespective of whether the arrestee was charged with an indictable or non-indictable offense, were required to completely disrobe while the officer had an opportunity to visually observe them.  Lt. Spina Dep. 152:1-153:1.  Even though Lt. Spina drew a distinction between this visual observation conducted when changing inmates who were arrested for non-indictable offenses and the more thorough strip searches for inmates charged with an indictable offense, he admitted there is no description of a strip search in Ocean County Jails's policy, that its written policy on strip searches was confusing, and that there

19

was no formal training, nor were there outlines or programs in place to train the officers about the requirements of the searches.  Id. 100:6-23, 235:7-236:16; Ex. D.

Furthermore, Defendants admit that Lt. Spina testified that during this changing process, the corrections officer stays in the room and makes visual observations of the inmate's body, looking for scars, tattoos, signs of infection or infestation, etc.  Df. Opp. at 9.  In addition, the Physical Search policy requires that "any person received from any jurisdiction to be remanded to this institution . . . shall be strip searched before being sent to the housing floor or any designated housing."  Ex. D at 21-22; Lt. Spina Dep. 244:9-17.  Thus, the Court concludes that by a preponderance of the evidence, Plaintiffs have presented evidence that Defendants had a policy or practice of requiring inmates to fully disrobe before receiving their jail garb prior to the installation of the curtain at the end of 2007.  Therefore, the Court is not persuaded by Defendants' objections to the proposed class as overly broad.

### B.  Rule 23(a) Requirements

#### 1.      Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable[.]"  Although no single magic number exists satisfying the numerosity requirement, Florence v. Bd. of Chosen Freeholders of the County of Burlington, No. 05-3619, 2008 WL 800970, at *6 (Mar. 20, 2008), the Third Circuit has previously held that the numerosity requirement will generally be satisfied "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40."  Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).  In their Complaint, Plaintiffs allege that there are approximately 4,000 people in the

proposed class.  Id. ¶¶ 18, 20.  Defendants concede that the number of the potential plaintiffs

exceeds forty.  Df. Opp. at 11.  Even though the size of the class not known at this time,

Defendants do not contest the numerosity requirement.  Id.  Since all non-indictable arrestees are

subjected to the same intake processes, which Plaintiffs claim amount to suspicionless strip

searches, the proposed class likely includes several hundred if not thousands of individuals.  See

Florence, 2008 WL 800970, at *7.  Because joinder of such a large number of plaintiffs is

impracticable, Plaintiffs satisfy the numerosity requirement.

### 2.      Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class[.]"  To

satisfy this requirement, the named plaintiffs must show that they "share at least one question of

fact or law with the grievances of the prospective class."  Stewart, 275 F.3d at 227 (citation

omitted); see also Baby Neal, 43 F.3d at 56 (citation omitted).  Commonality does not require

that members of the class share identical claims, rather the named plaintiffs' interests need only

be representative of the absent class members.  In re Community Bank of N. Va., 418 F.3d 277,

303 (3d Cir. 2005).  Further, "an allegation that the defendants' overall policy injured the

plaintiffs satisfies the commonality requirement."  Florence, 2008 WL 800970, at *7 (citation

omitted).

In this case, Plaintiffs have set forth a legitimate issue involving the same legal questions

for all plaintiffs in the proposed class:  whether requiring all pretrial detainees to completely

disrobe before a same sex corrections officer absent reasonable suspicion upon admittance to the

jail constitutes a blanket strip search policy that violates the Fourth Amendment and/or the New

Jersey law.  Plaintiffs allege that the proposed class members were all subjected to the uniform

policy of "clothing exchanges," which they claim involves suspicionless strip searching. Plaintiffs also contend that a common question of law exists as to whether there must be manipulation of the genitals, a spreading fo the buttocks and (for females) nude squatting and coughing for a strip search to be unconstitutional and whether these "clothing exchanges" occurred in lieu of a more intrusive strip search.  Defendants do not dispute that the proposed class meets the commonality requirement.  All of the proposed class members challenge the constitutionality of these procedures under the United States and New Jersey Constitutions. Thus, all plaintiffs claim that they were injured in substantially the same way by the execution of Defendants' allegedly unconstitutional policies or practices.  Accordingly, commonality is satisfied in this case.

### 3.      Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]"  "The typicality inquiry centers on whether the interests of the named plaintiffs align with the interests of the absent members."  Stewart, 275 F.3d at 227. It does not mandate that all putative class members share identical claims.  See Baby Neal, 43 F.3d at 56.  Although the proposed class representative must "possess the same interest and suffer the same injury as the class members," Falcon, 457 U.S. at 156, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."  Barnes v. The Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998).

Here, Plaintiffs allege that they were each subjected to the same changing procedures upon admission into the Ocean County Jail, which amounted to an unconstitutional suspicionless

strip search.  This claim is precisely the same as those of the absent putative class members because all non-indictable arrestees admitted to the facility are subjected to the same intake procedures, which allegedly require arrestees to completely disrobe while Defendants' officers view their nude bodies – at least prior to the end of 2007.  Thus, Plaintiffs' incentives in relation to this claim therefore seem to align perfectly with those of the rest of the newly defined class beginning November 28, 2005 and extending to December 28, 2007.  Accordingly, the Court concludes that the named Plaintiffs satisfy the typicality requirement.

Defendants, however, argue typicality is not satisfied in this case.  Defendants do not contend that the named Plaintiffs were not strip searched.  Instead, Defendants assert that their defenses against the individual Plaintiffs' claims are distinct.  Defendants note Mr. Wright and Mr. Bizzarro had been incarcerated on several occasions prior to the one that formed the basis of the instant action.[11]  In addition, Defendants point the Court to N.J.A.C. 10A:31-8.5(b)(6), which states that strip searches may be conducted "whenever the person admitted for a minor offense(s) is known to have a history of violent or assaultive conduct or a previous conviction(s) for a crime."  Thus, Defendants argue that because Mr. Wright and Mr. Bizzarro had both been arrested before, and Mr. Wright testified that he had pled guilty to a resisting arrest charge for which he had been incarcerated for eleven months, their defenses against these defenses <u>may</u> differ from those against Ms. Wedding or other members of the class.[12]      .

---

[11]Mr. Wright had been incarcerated approximately 10 times for misdemeanor offenses, Wright Dep. 23:21-24:4, and Mr. Bizzarro had been incarcerated about 100 times for failure to pay child support.  Bizzarro Dep. 8:5-13.

[12]Although the statute does permit officers to conduct strip searches when the person admitted for a minor offense has previous conviction(s) for a crime, there is no evidence that Defendants knew whether or not either Mr. Wright or Mr. Bizzarro had previous convictions.

Ms. Wedding, on the other hand, had not been incarcerated in Ocean County Jail prior to the incarceration set forth in this case.  Defendants, however, argue that because Ms. Wedding testified that she had lip and tongue piercings when she arrived at the jail, these piercings "may have provided reason to believe that she had other piercings that were hidden by clothing, thus providing reasonable suspicion to perform a strip search."  Df. Opp. at 13 (emphasis added).  Defendants also assert that "the issue of whether or not such circumstances provide reasonable suspicion for a search does not affect the issue that the defense to Ms. Wedding's claims vary [sic] significantly from those of purported class."  Id.  The Court disagrees with Defendants' arguments.

Here, Plaintiffs' claims clearly arise out of the same practice as the other proposed class members' claims, specifically, Defendants' procedures that require non-indictable arrestees to remove all of their clothing in front of an officer.  Based upon the totality of the circumstances, the officer must have reasonable suspicion to conduct such searches at the time the search was conducted.  See United States v. Whitted, 541 F.3d 480, 489 (3d Cir. 2008) (citing to United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).  Defendants failed to present any evidence that the officers who conducted each of the named plaintiffs' searches had reasonable suspicion at the time of the search to conduct a strip search upon changing the inmate.[13]  Moreover, Defendants cannot create post-hoc rationales to manufacture justifications

Nor has any evidence been presented that either Mr. Wright or Mr. Bizzaro is known to have or have a history of violent or assaultive conduct.  These potential defenses are not appropriate to address at this stage of litigation.

[13]The Court discusses the parties' arguments regarding whether reasonable suspicion issues predominate over the common issues of law and fact herein.  See Part III.C.1., infra.

for conducting strip searches.  The Ocean County Department of Corrections Policy Searches

Section 9.03A specifically requires that if there is reasonable suspicion, this suspicion must be

documented and approved by the Officer-in-Charge prior to the strip search taking place.  In this

case, there is no documentation of reasonable suspicion or approval for the strip searches

allegedly conducted on the named Plaintiffs, and thus, Defendants' arguments that Plaintiffs'

claims are not typical of the putative class are unavailing.

Mr. Wright's, Mr. Bizzarro's, and Ms. Wedding's claims are typical of the class as a

whole, insofar as each was instructed to completely disrobe and when completely nude was

observed by a corrections officer pursuant to the policies and practices pertaining to all newly

admitted pretrial detainees at Ocean County Jail.  Plaintiffs, and the proposed class members, all

suffered the same alleged invasions of privacy, which Plaintiffs claim violate federal and state

law.  See Wilson, 2009 WL 805179, at *5.  Thus, Plaintiffs' claims are typical of those of the

class.

### 4.    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class."  The Third Circuit had adopted a two-pronged test for determining the

adequacy of representation by the named Plaintiffs and their counsel:  "(a) the plaintiff's attorney

must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the

plaintiff must not have interests antagonistic to those of the class."  Wetzel v. Liberty Mut. Ins.

Co., 508 F.2d 239, 247 (3d Cir. 1975).  The burden to prove that the representation is not

adequate rests with the party challenging the class' representation.  See Wilson, 2009 WL

805179, at *6 (citations omitted).

25

In this case, Defendants do not challenge the adequacy of class counsel.  Moreover, after considering the submissions in support of the instant motion, the Court determines that the proposed class counsel is "qualified, experienced, and generally able to conduct the proposed litigation."  Wetzel, 508 F.2d at 247.  Defendants, however, do challenge the second-prong: Plaintiffs' ability to adequately represent the putative class as the named plaintiffs.  Defendants argue that "the interests of the class representatives are not necessarily the same as the interests of the class, generally, and may be considered antagonistic to those of the class."  Df. Opp. at 15. Defendants contend that the class representatives' claims are not typical of the defined class as a whole.  Most of Defendants' arguments are merely recapitulations of those they previously offered in the context of typicality, which the Court previously rejected.  For example, Defendants argue that two of the three named Plaintiffs had previously been incarcerated and the remaining named Plaintiff had visible body piercings that were not permitted in the jail.  The Court has already determined that these reasons do not warrant denial of class certification.

Defendants, however, contest Plaintiffs' representation of the putative class with respect to when the class should close.  Even though the County denies that any such unconstitutional policy, practice, and custom of conducting strip searches absent reasonable suspicion was ever in effect, Defendants assert that "there is certainly no question today that since November 2007, inmates incarcerated for non-indictable offenses are instructed to stand behind a curtain while changing into the prison uniform."  Df. Mot. at 16.  Essentially, Defendants argue the named Plaintiffs do not adequately represent the putative class as defined in the Complaint because at the end of 2007 the jail installed a second curtain behind which the arrestees for non-indictable offenses were directed to change search, and thus, any pretrial detainees after that time were

subjected to a different search.  Plaintiffs concur; the parties now agree that the class should close

on December 28, 2007 and that they will continue to work on the language of the policy now in

effect.  Therefore, the Court finds that Plaintiffs will adequately represent the class within the

defined limited class period.


### C.      Rule 23(b) Requirements

#### 1.      Predominance

In In re: Hydrogen Peroxide Antitrust Litig., The Third Circuit recently discussed

predominance:

> Predominance tests whether proposed classes are sufficiently cohesive to warrant
> adjudication by representation, a standard far more demanding than the commonality
> requirement of Rule 23(a), requiring more than a common claim.  Issues common to the
> class must predominate over individual issues.  Because the nature of the evidence that
> will suffice to resolve a question determines whether the question is common or
> individual, a district court must formulate some prediction as to how specific issues will
> play out in order to determine whether common or individual issues predominate in a
> given case.  If proof of the essential elements of the cause of action requires individual
> treatment, then class certification is unsuitable.

552 F.3d at 310-11 (internal citations and quotations omitted).  The Court must "examine the

elements of Plaintiffs' claim through the prism of Rule 23" to determine whether Plaintiffs

satisfy the predominance requirement.  Id. at 311.

Plaintiffs bear the burden of showing that the elements of their claim are "capable of

proof at trial through evidence that is common to the class rather than individual to its members."

Id. at 311-12.  "The Fourth Amendment prohibits only unreasonable searches."  Bell v. Wolfish,

441 U.S. 520, 558 (1979)  If this case goes to trial, Plaintiffs will have to prove that they were

searched and that search was unreasonable.  See Wilson, 2009 WL 805179, at *7.[14]  In this case, Plaintiffs assert that the putative class members' claims involve the same legal question of whether Defendants' "policy of strip searching every pretrial detainee admitted to [Ocean County Jail is] constitutional where these detainees are made to disrobe in the presence of a correctional officer, without considering the crime charged or the circumstances of arrest."  Pl. Mot. at 15-16. Plaintiffs also state that the proposed class members share the same factual question of whether "such practices exist[ed] during the class period."  This Court, like many others, finds that Plaintiffs' challenge to Defendants' alleged policy or practice of using intake procedures for non-indictable arrestees, which are tantamount to suspicionless strip searches, turns on generalized, not individualized, proof and thus, common issues predominate.  See, e.g., Wilson, 2009 WL 805179, at *7; Florence, 2008 WL 800970, at *12; Johnson v. District of Columbia, No. 02-2364, 2008 WL 344739, at *25-27 (D.D.C. Feb. 8, 2008).

Here, Defendants admit that the named class representatives were all arrested and charged with non-indictable offenses.  At issue in this lawsuit is whether Defendants' blanket policies and practices of requiring inmates to strip their clothing in front of an officer violate federal and/ or state law.  The manner in which the inmates were changed is basically the same in each instance because the observation is done pursuant to the blanket policy and practices implements by Defendants.  Thus, "[w]hether those policies and practices violated class members' state or federal rights is also subject to common determination insofar as the asserted invasion of privacy is the same: the class members' privacy interest in keeping private their nude body and

---

[14]Plaintiffs must also prove that Defendants are state actors for purposes of § 1983 and the New Jersey Civil Rights Act, however, this does not appear to be disputed in this case.

maintaining their personal dignity." Wilson, 2009 WL 805179, at *8 (citations omitted).

Defendants, however, argue that individual issues predominate, here because there are significant differences between each of Plaintiffs' cases and those of the proposed class. First, as previously addressed by the Court, Defendants claim that there was reason to strip search both Mr. Wright and Mr. Bizzarro pursuant to N.J.A.C. 10A:31-8.5(b)(6), and there was reasonable suspicion to strip search Ms. Wedding based on her piercings. See Part III.B.3., supra. Defendants argue that the Court would have to investigate the criminal records of each class member to determine whether or not the search was proper under N.J.A.C. 10A:31-8.5(b)(6),[15] and also conduct separate inquiries to determine whether reasonable suspicion existed in each case. These arguments are similar to the ones raised by the defendants and previously rejected by the courts in Wilson and Florence. Essentially, Defendants, here, argue that liability will turn on whether particular searches of individual arrestees were constitutionally justified.

Plaintiffs argue that even if reasonable suspicion existed, and Plaintiffs do not concede it did, these issues do not predominate over the common issues of law and fact. Plaintiffs argue that if such issues did predominate, then strip search cases could never be certified as class actions. As discussed herein, based on the record, it appears that all non-indictable arrestees at the Ocean County Jail are subjected to the same policies and procedures upon admittance to the

---

[15]Plaintiffs argue that the New Jersey Administrative Code procedure could itself be unconstitutional. Pl. Reply at 10 n. 6. For support that the statute and code provisions could be unconstitutional, Plaintiffs cite to Ernst v. Fort Lee, 739 F. Supp. 220, 225 (D.N.J. 1990), finding that the "provisions of the Fort Lee operations manual, and those sections of the Strip Search Act upon which it is based, do not pass muster under the Constitution to the extent that they permit the indiscriminate strip search of an arrestee on a minor offense without requiring reasonable suspicion that the arrestee is concealing a weapon or harboring contraband or drugs." Id. However, although Plaintiffs challenge Ocean County Jail's generalized policies, they correctly assert that this issue is not before the Court on this motion.

facility.  Like in <u>Florence</u>, the Court "disagrees with the notion that liability will turn on individual questions relating to the justification for strip searches of particular arrestees.  Rather, liability will seemingly boil down to whether the intake procedures, which require Defendants' officers to view the nude bodies of non-indictable arrestees, are tantamount to strip searches." 2008 WL 800970, at *13.  This Court, like others, must reject Defendants' arguments – that liability turns on whether particular searches of particular arrestees where constitutionally justified – and certify this class action lawsuit involving blanket strip search policies.  <u>See Id.</u> at *12; <u>Johnson v. District of Columbia</u>, No. 02-2364, 2008 WL 344739, at *25-27 (D.D.C. Feb. 8, 2008).  Only generalized proofs are required to prove Plaintiffs' claims here.  <u>See Florence</u>, 2008 WL 800970, at *13; <u>Johnson</u>, 2008 WL 344739, at *25-27.

"It is not at all clear that individualized reasonable suspicion has any significant role to play in this case, at least with respect to liability, because . . . the policies and practices at issue apply without regard to individualized reasonable suspicion . . . [and] [m]ore importantly . . . Plaintiffs assert a facial attack on the [Defendants'] policies and practices" of blanket strip searches absent reasonable suspicion."  <u>Wilson</u>, 2009 WL 805179, at *8.  "Thus, if the policy is unconstitutional as to any member of the class, Plaintiffs will be entitled to at least some form of relief, even if the policies and practices, as applied, are determined not to violate the constitutional rights of some of the class members."  <u>Id.</u>[16]  Therefore, the Court finds Defendants' arguments that individual determinations of reasonable suspicion predominate the common issues to be litigated on a class-wide basis unpersuasive.  <u>See Id.</u>

---

[16]Indeed, it can be determined if any class members were strip searched pursuant to the reasonable suspicion exception by reviewing documentation which must be filed in these circumstances.  <u>See</u> Policy Searches, Section 9.03A.

Second, Defendants assert that individual damage issues predominate because the alleged individual damages sustained by the named Plaintiffs differ.  Defendants argue that the Court would need to conduct separate inquiries (or mini-trials) regarding damages for each named Plaintiff and each putative class member because each will have to present his own proof of damages depending on the scope of the illegal search he allegedly suffered, the number of previous incarcerations, and the number of times he has been incarcerated during the class period.[17]  While some members of the putative class may have suffered more invasive searches, and would therefore be entitled to greater damages than others, the Court does not find this argument persuasive.  The Third Circuit has held that courts have "commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."  Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).  Moreover, "[c]ourts routinely find predominance satisfied in class action strip search cases notwithstanding the possibility that an individualized calculation of damages may be necessary."  Wilson, 2009 WL 805179, at *8 (quoting Florence, 2008 WL 800970, at *13 (citing cases)).  Thus, individual damage issues do

---

[17]Defendants cite to Barabin v. Aramark Corp., No. 02-8057, 2003 WL 355417 (3d Cir. Jan. 24, 2003) for support that this Court should find that individual damage claims would predominate over the commons issues.  In Barabin, however, the district court found and the Third Circuit affirmed that predominance was not satisfied because "it is clear from the complaint that while all of the plaintiffs aver that they were 'subjected to frequent harassment and unjustified disciplinary sanctions by Caucasian supervisors not imposed on similarly situated Caucasian employees,' the circumstances under which those acts of discrimination were committed and the resultant injuries are unique to each individual plaintiff. The plaintiffs' individual claims for damages  would therefore require individualized evaluations and findings of the facts and defenses."  Id. at *7-8.  Barabin differs from the instant case, where Plaintiffs complain of Defendants' uniform or de facto policy of strip searching inmates, which does provide for common issue predominance.  See, e.g., Wilson, 2009 WL 805179, at *8 (citing Florence, 2008 WL 800970, at *13).

not predominate here.  Accordingly, the Court finds that common issues predominate in this case.

### 2.    Superiority

Here, Defendants do not argue that a class action would not be the superior method of adjudicating Plaintiffs' claims.  Rule 23(b)(3) provides a non-exhaustive list of several factors to help determine whether a class action is the superior method of adjudication:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  In this case, all four factors favor class certification.  For the following reasons, the Court concludes that a class action is superior than litigation by individual class members.

Plaintiffs focus on the first factor to support their position that a class action is the superior method of proceeding with their claims.  "It is generally recognized that class certification is preferred where the recovery being sought by each of the plaintiffs is not sufficiently large to render individualized litigation a realistic possibility.'"  Florence, 2008 WL 800970, at *14 (internal quotations and citations omitted).  Because recovery by each putative class member would likely be small, they have little incentive to pursue their individual claims against Defendants for their alleged unconstitutional practices. Two other courts in this district have reached the same conclusion in similar "strip

search" cases.  See Wilson, 2009 WL 805179, at *9 ("Given the relatively small economic stake that any one class member has in this case, the Court concludes that the first (23(b)(3)) factor favors class treatment.") (quoting Florence, 2008 WL 800970, at *14).  Similarly, the Court finds that due to the nature of Plaintiffs' claims, most of the proposed class members would not independently assert their claims.

Second, the parties have not identified, nor is the Court aware of, any other strip search litigation involving the Ocean County Jail policies and procedures at issue here.  Thus, the second factor also favors class certification.  The third factor favors class certification because it is generally "desirable to litigate similar, related claims in one forum."  Florence, 2008 WL 800970, at *14 (citation omitted).  Here, the Court has determined that common issues of law and fact predominate this litigation, and therefore, judicial interests of economy and efficiency also weigh in favor of a class action.  Moreover, "the class action vehicle is particularly suitable when, as here, Plaintiffs seek institutional reform."  Wilson, 2009 WL 805179, at *10.  Lastly, with respect to the fourth superiority factor, the Court determines that there do not appear to be any difficulties in managing this case.  However, to the extent that any do exist, the Court has adequately remedied them by certifying the liability and damages issues separately.  See Part III.D., infra.  Therefore, the fourth factor also supports Plaintiffs' contention that the class action is the superior method of litigation here.  Accordingly, the Court finds that superiority is met in this case, and for the foregoing reasons, the Court will certify the

damages portion of Plaintiffs' suit under Rule 23(b)(3).[18]

####    D.    Appointment of Class Counsel

The Court must appoint class counsel pursuant to Rule 23(g)(1).  As discussed herein, the Court finds that Plaintiffs' counsel is "qualified, experienced, and generally able to conduct the proposed litigation."  Wetzel, 508 F.2d at 247.  Accordingly, the Court will therefore appoint them as class counsel.

#### IV.    Conclusion

For the reasons stated herein, the Court grants the motion and certify the class now defined as between November 28, 2005 through December 28, 2007 in which Plaintiffs seek compensatory and punitive damages under Rule 23(b)(3).  The Court directs Plaintiffs to file a Third Amended Complaint consistent with the Court's ruling, i.e. reflecting the modified time period of the class and requested relief, within twenty (20) days.  The Court will issue an appropriate Order in accordance with Fed. R. Civ. P. 23(c) and (g).

---

[18]In the alternative, Plaintiffs seek certification under Rule 23(b)(2), which is usually satisfied in actions where Plaintiffs primarily seek injunctive relief.  Although Plaintiffs sought injunctive relief in their Complaint, Plaintiffs concede that this request is not being pursued at this time because Defendants have adopted a written policy with respect to the changing of inmates and they only pursue monetary damages here.  Because Plaintiffs no longer seek injunctive relief, the Court need not address the parties' arguments further in this connection.

/s/  Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge


Dated:  June 9, 2009