**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                        :

|  |  |  |
|---|---|---|
| EDWARD BIZZARRO, RICHARD | : |  |
| WRIGHT, and APRIL WEDDING, | : | Civ. Action No.: 07-5665 (FLW) (DEA) |
| individually and on behalf of a Class | : |  |
| of others similarly situated, | : | **OPINION** |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| OCEAN COUNTY, OCEAN COUNTY | : |  |
| DEPARTMENT OF CORRECTIONS, | : |  |
| THEODORE J. HUNTER, both | : |  |
| individually and in his official capacity | : |  |
| as Warden of the Ocean County Jail, | : |  |
| and SANDRA MUELLER, both | : |  |
| individually and in her official capacity as | : |  |
| Chief of Corrections of the Ocean County | : |  |
| Department of Corrections, | : |  |
|  | : |  |
| Defendants. | : |  |

_____:

**<u>WOLFSON</u>, <u>United States District Judge</u>:**

      Plaintiffs April Wedding ("Wedding"), Richard Wright ("Wright") and Edward Bizzarro

("Bizzarro") (collectively, "Plaintiffs") initiated this putative class action to seek redress for

allegedly being subjected to strip searches during the intake procedure at the Ocean County

Correctional Facility ("Ocean County Jail") between November 28, 2005 and December 28,

2007.  Plaintiffs assert that such routine, suspicionless strip searches violated their rights under

the Fourth Amendment of the United States Constitution, as well as the New Jersey Constitution

and the New Jersey Strip Search Statute.  The defendants named are the Ocean County, the

Ocean County Department of Corrections, Theodore J. Hutler, Jr. ("Hutler"), the Warden of the

1

Ocean County Jail, and Sandra Mueller ("Mueller"), the Chief of Corrections of the Ocean

County Jail (collectively "Defendants").

Presently before the Court is Defendants' motion for summary judgment, pursuant to

Fed. R. Civ. P. 56, and Plaintiffs' cross-motion to appoint Carol Poplar, Esq. as co-class counsel.

For the reasons set forth below, Plaintiffs' unopposed cross-motion to appoint co-counsel is

**GRANTED**, and Carl Poplar is hereby approved as co-class counsel *nunc pro tunc* to November

6, 2013, the date on which Mr. Poplar entered his appearance on behalf of Plaintiffs.

Additionally, Defendants' motion for summary judgment is **GRANTED**, and Plaintiffs' Fourth

Amendment claim in Count One is hereby dismissed.  This Court declines to exercise

supplemental jurisdiction over Plaintiffs' remaining state law claims in Counts One and Two.

Therefore, those claims are dismissed without prejudice and the applicable statutes of limitations

are tolled, and Plaintiffs may re-file their state law claims in State court within thirty (30) days

from the date of the Order accompanying this Opinion.  See 28 U.S.C.S. § 1367(c)-(d).

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

A.      **Testimony of Plaintiff Wedding**

In August 2007, a police officer pulled Wedding over for a moving violation.  See

Declaration of William A. Riback, Esq. ("Riback Decl."), Ex. A, Deposition of April Wedding

("Wedding Dep.") at 5:21-22, 6:14-18.  During the traffic stop, the police officer informed

Wedding that she had an outstanding warrant for failure to pay a traffic fine of $431.  Id. at 8:4-

20, 12:18-23.  Based on that warrant, the officer proceeded to arrest Wedding and transport her

to the Ocean County Jail.  Id. at 5:14-6:13, 14:23-15:25.  After arriving at the detection center,

Wedding was escorted to the booking desk where she provided an officer with her personal

information.  Id. at 14:23-15:25.  When she informed the booking officer that she could not make

bail, Wedding testified that she was detained and strip searched.  Id. at 22:12-14.

       With respect to that search, a female officer escorted Wedding to the shower room,

located adjacent to the booking desk, and partially closed the curtain separating the two rooms.

Id. at 16:25-17:16, 18:9-10.  The officer directed Wedding to remove her jewelry, including her

lip ring and tongue ring, and all of her clothes.  Id. at 18:17-19:6-23.  From about three feet

away, the officer inspected Wedding's clothes, and then instructed Wedding to lift her breast and

turn around, bend over, squat and cough.  Id. at 19:17-20:19, 21:1-2.  In addition, the officer also

visually inspected Wedding's mouth.  Id. at 19:15-19.  During the search, which lasted about five

minutes, Wedding testified that she was never physically touched by the officer.  Id. at 21:3-12,

23:12-16.  After the search, the officer gave Wedding back her own underwear and a prison

uniform to wear.  Id. at 23:17-24:1.  Wedding was held at the Ocean Jail for two days.  Id. at

27:21-28:9.  Although she was initially placed in a holding cell, Wedding was transferred to

general population before her mother posted bail.  Id. at 29:2-22, 30:5-31:23.

### B.      Testimony of Plaintiff Wright

       In October 2007, Wright turned himself into the Toms River Police Department on a

warrant for failure to pay child support in the amount of $5,129.58.  See Riback Decl., Ex. B,

Deposition of Richard Wright ("Wright Dep.") at 6:18-19, 7:8-11, 8:4-10.  Wright was taken to

the Ocean County Jail, where he was escorted through the basement entrance to the booking

area.  Id. at 8:21-23, 9:23-10:12.  There, Wright provided his personal information to the booking

officer, and allegedly told the officer that he was planning on posting bail.  Id. at 10:24-11:14.

Nevertheless, Wright testified that he was not permitted to make a phone call until after he was

"changed."  Id. at 12:20-25.  A male officer brought Wright to "the changing room," which was

adjacent to the booking area and contained a shower and a sink area. Id. at 13:3-20, 16:12-14. Although the doorway to the changing room had a curtain on it, Wright testified that the curtain remained open during his entire changing and search process. Id. at 13:21-14:3.

During the strip search, the officer directed Wright to remove all of his clothes, including his underwear, and the officer proceeded to visually inspect Wright's clothes. Id. at 14:6-18. As directed, Wright opened his mouth, and lifted his tongue. Id. at 15:17-22. Wright testified that the officer then instructed him to "lift [his] scrotum sacs" and "turn around, put [his] hands on the wall and then [he] was told to lift [his] feet in the air, one at a time and then [he] was told to spread [his] buttocks." Id. at 16:2-20. While it does not appear that the officer ever touched Wright, he remained in close proximity to Wright throughout the inspection. Id. at 15:21-16:1. When the search was completed, Wright was permitted to put on a prison uniform and slippers. Id. at 17:14-22. Wright then called his girlfriend, who brought the money to the child support collection office in Toms River the same day. Id. at 11:15-12:10, 19:18-20:4. Approximately twelve hours after Wright was arrested, he made bail and was released. Id. at 20:22-21:8. Wright was never transferred to the general population.

**C.    Testimony of Plaintiff Bizzarro**

In September 2007, pursuant to a warrant, several Ocean County sheriff's officers arrested Bizzarro at his home for failure to pay child support. See Riback Decl., Ex. E, Deposition of Edward Bizzarro ("Bizzarro Dep.") at 10:20-11:7, 29:2-12, 30:8-10. After arriving at the Ocean County Jail, Bizzarro was taken to the booking area where he waited for about thirty minutes. Id. at 16:13-17:6, 18:11-23. Bizzarro testified that, before he provided his personal information to the booking officer, he was taken to the changing room. Id. at 18:24-19:11. According to Bizzarro, the changing room was separated from the booking area with a

curtain.  Id. at 20:2-17.  An officer directed Bizzarro to stand against the wall and remove all of his clothes.  Id. at 20:21-21:11.

The officer allegedly instructed Bizzarro to lift his genitals, and then to bend down, spread his butt cheeks and cough so the officer could check his "anal area" and "look up his rectum."  Id. at 20:21-21:11, 22:6-10, 23:9-12.  Next, the officer instructed Bizzarro to lift his feet and open his mouth.  Id. at 22:11-19, 23:6-7.  Throughout the strip search, the officer stood approximately four feet away from Bizzarro.  Id. at 21:25-22:5.  After the officer completed his inspection, he gave Bizzarro back his underwear and provided him with a prison uniform and a pair of flip-flops to wear.  Id. at 24:2-12.  Bizzarro again waited on the bench to be photographed before he was taken to a crowded holding cell.  Id. at 26:18-28:2.  Ultimately, Bizzarro was moved to general population where he was held for a week before he was released on bail.  Id. at 26:32:7-16, 28:3-8.

### D.    Ocean County Jail Policies and Procedures

Section 9.03 of the Ocean County Department of Corrections Policies and Procedures (the "Policy"), effective from November 2005 through December 2007, contained the Ocean County Jail's inmate searching procedures.[1]  See Riback Decl., Ex. F, the Policy at § 9.03. Specifically, the purpose of the Policy "[was] to establish the guidelines and procedure used to search inmates conscientiously, efficiently, and as often as deemed necessary to ensure the safety and security of the facility."  Id.  The Policy stated that strip searches are necessary to prevent contraband from entering the facility, and "[a]ll inmates admitted… shall be thoroughly searched."  Id. at § 9.03.01.

---

[1] It is undisputed that the Policy was subsequently amended in 2008.

Under the section for strip searches, the Policy stated that "[t]he human body can serve as a potential hiding place for contraband," and "it may become necessary to strip search an inmate at various times." Id. at § 9.03.03(A). However, the Policy distinguished between persons detained for indictable and non-indictable offenses. Id. With respect to persons detained for non-indictable offenses, the Policy provided that "[a] person who has been detained or arrested for [the] commission of an offense other than a crime and who is confined in this facility shall not be subject to a strip search unless there is reasonable suspicion that a weapon, controlled dangerous substance, or contraband will be found."[2] Id. at § 9.03.04(A). Although the Policy distinguished between persons detained for indictable and non-indictable offenses, it further stated that strip searches may be conducted "[p]rior to admitting a person lawfully confined to the facility by court order or pursuant to an arrest authorized by law." Id. at § 9.03.05(B)(1).

Lieutenant Anthony Spina ("Lt. Spina"),[3] who supervised the booking and classification of inmates entering the Ocean County Jail, testified that there was no description or instruction on how to perform a strip search in the Policy, and that there had been no formal training, nor outlines or programs in place to train the officers about the requirements of these searches. See Riback Decl., Ex. G, Deposition of Lt. Spina ("Lt. Spina Dep.") at 100:6-23, 235:7-236:16. Rather, the officers were taught to perform strip searches at the "corrections academy." Id. at 100:20-101:15. According to Lt. Spina, a strip search was considered "[a] thorough search of an

---

[2] The Policy expressly referenced the New Jersey Administrative Code, which provides that "[a] person who has been detained or arrested for [the] commission of an offense other than a crime and who is confined in an adult correctional facility shall not be subject to a strip search unless" there is "a reasonable suspicion that a weapon, controlled dangerous substance or contraband will be found." N.J.A.C. § 10A:31-8.4(a).

[3] Lt. Spina testified, in this case, as a representative of Ocean County in accordance with Fed. R. Civ. P. 30(b)(6).

unclothed person including an inspection of the genitals and anal areas and really a systematic search." Id. at 98:24-99:6.

In regard to the intake procedure during the class period, Lt. Spina testified that a newly admitted inmate was "escorted up to the booking desk by a police officer and their paperwork [was] presented to one of the booking officers…." Id. at 76:15-18.  That officer first determined whether the inmate was mentally fit for incarceration.  Id. at 76:20-77:2.  If so, the officer would pat down the inmate, remove any physical restraints and begin to process that person.  Id. According to Lt. Spina, the inmate was then asked whether he or she can post bail.  Id. at 77:3-17.  "[I]f the person was not going to bail out then they would be brought back to our changing area where their clothing would be taken and they would be issued a jail jump suit and then issued bedding.  Their property would be checked in and inventoried… and then they would be put in our… holding cell in that area where the prisoners that are waiting to be housed upstairs…." Id.

Relevant here is the process known as "changing the inmate." Id. at 150:24-151:17.  Lt. Spina described the place where the inmates were searched as a changing area with a bench seat on the wall to the left and two showers on the right.  Id. at 97:2-21.  This area was separated from the property room and the booking desk by a curtain.  Id.  Lt. Spina acknowledged that all pretrial detainees were required to completely remove all of their clothing, including underwear, while an officer had an opportunity to visually observe them.  Id. at 152:1-153:1.  Specifically, an inmate was instructed to manipulate their genitals, bend down and spread their butt cheeks and cough.  Id. at 99:7-100:5, 123:12-24.  Lt. Spina testified that these searches were performed without consideration of the inmate's charge, prior institutional or criminal history or whether

there was any reason to believe that the inmate was concealing contraband.  Id. at 150:24-151:17, 152:1-153:1.

According to Sergeant Lori Ann Martin ("Sgt. Martin"),[4] an officer at the Ocean County Jail during the class period, the inmate changing and searches were performed before the inmate was "medically screened, [as well as] interviewed by classification personnel."  Riback Decl., Ex. H, Deposition of Sgt. Martin ("Sgt. Martin Dep.") at 42:22-43:3.  After the medical examination was completed, Sgt. Martin testified that the officers would assess the potential risk of an inmate to the security of the facility based on several factors, including the severity of the offense committed and prior criminal history.  Id. at 65:7-15, 78:21-79:1.  While classification was generally done in the morning, that process often continued into the late afternoon.  Id. at 62:12-20.  Once the classification determination was made, the inmate was introduced into the general population of the Ocean County Jail.  Id. at 78:21-79:1.  According to Lt. Spina, it could take approximately one day before an inmate was finally admitted into the general population. See Lt. Spina Dep. at 111:13-114:4.

In late 2007, Lt. Spina recommended that the Ocean County Jail install an opaque "privacy" curtain in one of the shower stalls in the changing area.  Id. at 121:10-124:23, 126:17-24.  This "privacy" curtain replaced the full curtain with a shorter curtain that enabled officers to see an inmate's head and everything from their thighs down.  Id. at 127:3-12.  Lt. Spina testified that the decision to install the curtain was to "get away from the perception that the [non-indictable] inmates were being strip searched…."  Id. at 122:19-123:11.  However, he explained that he was not aware of any detainees who had ever made complaints to corrections officers that

_____

[4] Sgt. Martin testified, in this case, as a representative of Ocean County in accordance with Fed. R. Civ. P. 30(b)(6).

they were strip searched. Id. at 123:12-24. After the curtain was installed in 2008, pretrial detainees charged with non-indictable offenses were no longer required to completely disrobe in front of a corrections officer for visual observation or inspection. Rather, the inmate would be afforded privacy behind the curtain while the officer could still monitor the inmate during the clothing change.

### E.    Procedural History

On November 28, 2007, Plaintiffs Jose Garcia ("Garcia"), Wesley K. Bell ("Bell"), Bizzarro and Wright filed this action against Defendants. On January 11, 2008, those Plaintiffs filed an Amended Complaint. Three days later, Wedding was added as a plaintiff in this matter. By an Order dated June 5, 2008, Plaintiffs Garcia and Bell, who is now deceased, were voluntarily dismissed from this action by stipulation. Thus, the remaining Plaintiffs are Bizzarro, Wright and Wedding. These Plaintiffs filed their Second Amended Complaint against Defendants on September 15, 2008. On October 18, 2008, Plaintiffs filed a motion to certify the class. In a written Opinion, dated June 9, 2009, this Court granted Plaintiffs' motion and approved the following attorneys as class counsel: Elmer R. Keach, III, Esq., Seth Lesser, Esq., Fran L. Rudich, Esq., Charles LaDuca, Esq., Alexandra C. Warren, Esq. and William A. Riback, Esq.[5] In accordance with the dictates of that Opinion, Plaintiffs then filed their Third Amended Complaint on June 29, 2009.

---

[5] As discussed infra, after being approved by this Court, the following attorneys withdrew their appearance as counsel for Plaintiffs and the class: Mr. Lesser, Ms. Rudich, Mr. LaDuca and Ms. Warren. In addition, Mr. Keach submitted a letter to the Magistrate Judge seeking "guidance regarding the procedure [he] should use to end [his] involvement in this case." Dkt. No. 57. The Magistrate Judge instructed Mr. Keach to file an application to withdraw, but it appears that he never did so. Thus, the remaining class counsel are Messrs. Keach and Riback. In November 2013, Carl D. Poplar, Esq. filed his notice of appearance on behalf of Plaintiffs in this case, but he has not been approved by this Court as co-class counsel.

On August 18, 2009, Defendants filed a motion to stay the proceeding pending a decision from the Third Circuit in <u>Florence v. Board of Chosen Freeholders of the County of Burlington</u>, 621 F.3d 296 (3d Cir. 2010), which this Court granted on November 16, 2009, and the case was administratively terminated. After the Third Circuit decided the case in <u>Florence</u>, on March 3, 2011, Plaintiffs filed a motion to lift the stay of proceedings, even though the plaintiff in <u>Florence</u> filed a Petition for a Writ of Certiorari with the United States Supreme Court on January 19, 2011. The Supreme Court granted the petition in <u>Florence</u> on April 4, 2011. On April 12, 2011, this Court denied Plaintiffs' motion and concluded that this case would remain administratively terminated pending a decision by the Supreme Court in <u>Florence</u>. On April 2, 2012, the Supreme Court decided <u>Florence v. Board of Chosen Freeholders of County of Burlington</u>, 566 U.S. 318 (2012).[6]

More than one year later, Plaintiffs filed a motion to lift the stay of proceedings and for leave to file an amended complaint. On March 13, 2014, the Magistrate Judge granted Plaintiffs' motion, and Plaintiffs filed their Fourth Amended Complaint on March 25, 2014.[7] In their Fourth Amended Complaint, Plaintiffs define the class as follows:

> All persons who have been (1) detained at and/or placed into the custody of the Ocean County Jail or any facility under the authority of Ocean County (2) as a result of being arrested and/or charged with non-indictable offenses such as: civil

---

[6] In <u>Florence</u>, the Court addressed "whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed." <u>Florence</u>, 566 U.S. at 322. Reasoning that correctional officers at jails have a "significant interest in conducting a thorough search as a standard part of the intake process," <u>id.</u> at 330, the Court concluded that a policy and practice of routine, suspicionless strip searches of all detainees, including minor offenders, that will be housed in the general population does not violate the Fourth Amendment, <u>id.</u> at 339.

[7] Although Mr. Riback signed and filed the Fourth Amended Complaint, both Messrs. Riback and Poplar are listed on the docket as counsel for Plaintiffs and the class. Mr. Keach is not listed on that complaint.

enforcement offenses, i.e., child support enforcement arrears, traffic offenses, petty disorderly offenses, disorderly persons offenses, misdemeanors, contempt proceedings, failure to pay financial fines, penalties and/or costs in like matters as set forth above, and/or failure to appear at any court proceedings on like matters above; (3) were strip searched upon their entry into detainment and/or custody at the Ocean County Jail or were strip searched prior to an appearance before a judge or judicial officer who had the authority to release the person as referred to above from detainment and/or custody and were strip searched as set forth above, or were strip searched and placed into general population; and (4) the strip search was conducted and/or performed according to Ocean County's blanket strip search policy, that is, without reasonable suspicion and/or probable cause based on objective and articulable facts that the aforesaid person or persons possessed controlled dangerous substances, weapons and/or contraband. The class period commences on November 28, 2005 and ends on December 28, 2007.

Fourth Am. Compl., ¶ 17. According to Plaintiffs, the size of the class totals at least 4,000

persons. Id. at ¶ 19. In Count One, Plaintiffs assert a claim for violations of the Fourth

Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, as well as Article I,

Paragraph 7 of the New Jersey Constitution, pursuant to the New Jersey Civil Rights Act

("NJCRA"), N.J.S.A. § 10:6-1, et seq. In Count Two, Plaintiffs assert a claim for violation of

the New Jersey Strip Search Statute under the NJCRA.

On January 15, 2015, Defendants filed the instant motion for summary judgment, which

Plaintiffs opposed, and Plaintiffs cross-moved to appoint Carol Poplar, Esq. as co-class counsel.

While the motions were pending, on July 1, 2015, Plaintiffs filed a motion for leave to file

supplemental briefing addressing several recent opinions. On August 3, 2015, the Magistrate

Judge granted Plaintiffs' motion and administratively terminated the pending motion for

summary judgment. On August 10, 2015, Plaintiffs filed their supplemental brief and

Defendants responded on August 24, 2015. Upon the request of Plaintiffs, this Court granted

Plaintiffs' request to file a three-page reply to Defendants' response, which Plaintiffs

subsequently filed on August 31, 2015. On September 22, 2015, this Court administratively

terminated Plaintiffs' cross-motion to appoint Carl D. Poplar.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Anderson, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." Id. at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2)

demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Id. Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324; see also Matsushita, 475 U.S. at 586; Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323; see Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).

## III. DISCUSSION

### A. Appointment of Class Counsel

In an Opinion, dated June 9, 2009, this Court appointed Plaintiffs' attorneys as class counsel, but several attorneys subsequently withdrew their appearances in this case.[8] On

---

[8] While Mr. Keach expressed a desire to withdraw as counsel, he never actually filed such an application and, consequently, he is still listed as co-class counsel in this matter. Nevertheless, it appears that Mr. Keach is no longer an active participant in this litigation, since he was not

November 6, 2013, Mr. Poplar filed his appearance on behalf of Plaintiffs, but he has not been approved as a co-class counsel. In their cross-motion, Plaintiffs specifically submit that "Carl Poplar, Esquire is qualified and should be appointed as co-Class Counsel." Pl.'s Br. in Opp. at p. 34. In support of that motion, Mr. Poplar has supplied a supplemental certification concerning his qualifications. Defendants do not oppose Plaintiffs' cross-motion to appoint to Mr. Poplar.

The Third Circuit has adopted a two-prong test for determining the adequacy of representation by the named Plaintiffs and their counsel: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975). The burden of proving that the representation is not adequate rests with the party challenging the class' representation. Wilson v. County of Gloucester, 256 F.R.D. 479, 487-88 (D.N.J. 2009); see Schwartz v. Avis Rent a Car Sys., LLC, No. 11-4052, 2014 WL 4272018, at *16 (D.N.J. Aug. 28, 2014). Because this Court has previously determined that Plaintiffs are representative of the class, the only question is whether Mr. Poplar is capable of adequately represent the class.

In his certification, dated September 29, 2015, Mr. Poplar states that he graduated from Rutgers School of Law – Camden, and that he is certified as both a criminal and civil trial attorney by the New Jersey Board on Trial Attorney Certification. See Dkt. No. 116, Ex. A. Mr. Poplar is also a member of several professional organizations, including the American College of Trial Lawyers, and he has "lectured in numerous Continuing Legal Education programs and [has] been an Adjunct Professor of Trial Advocacy at Rutgers School of Law – Camden." Id. at

---

involved in filing the Fourth Amended Complaint, nor the opposition to Defendants' instant motion and Plaintiffs' cross-motion to appoint Mr. Poplar as co-class counsel.

¶ 4. Mr. Poplar explains that he has substantial experience conducting class action litigation. See Id. at ¶ 5. Relevant here, Mr. Poplar certifies that he is "co-lead counsel with William Riback in [five] class action strip search litigation[s]." Id. Mr. Poplar also certifies that he is presently involved in six other class litigations in both federal and state courts. Id. at ¶ 6. Accordingly, based on his certification and Defendants' non-objection to his appointment, the Court finds that Mr. Poplar is "qualified, experienced, and generally able to conduct the proposed litigation," and as such, approves Mr. Poplar as co-class counsel *nunc pro tunc* to November 6, 2013, the date that Mr. Poplar filed his notice of appearance here. See Wetzel, 508 F.2d at 247.

**B.    § 1983 Claim for Violation of the Fourth Amendment**

In Count One, Plaintiffs assert that Defendants, specifically Hunter and Mueller, implemented a policy and practice of strip searching all detainees, including detainees charged with non-indictable offenses, as part of the intake procedure at the Ocean County Jail from November 28, 2005 through December 28, 2007. Plaintiffs assert that these strip searches occurred before detainees appeared before a judge, and that the Ocean County Jail should have segregated detainees charged with non-indictable offenses from the general population because they are frequently not dangerous and are often released shortly after being placed in custody. Finally, Plaintiffs assert that correctional officers at the Ocean County Jail performed these strip searches regardless of the nature of the crime charged or the existence of reasonable suspicion that the detainee was concealing a weapon or some other contraband.

With respect to Plaintiffs' claim for violation of the Fourth Amendment, Defendants argue that the Supreme Court in Florence held that correctional officials are allowed to conduct a strip search of all detainees, including detainees charged with non-indictable offenses, who are

assigned to the general population of a detention center. Thus, Defendants contend that Ocean County Jail's policy and practice, in 2005 through 2007, of performing strip searches before detainees were committed to the general population is constitutional under the Fourth Amendment. In response, Plaintiffs argue that Defendants' written policy and practice of strip searching detainees charged with non-indictable offenses is unconstitutional, since the circumstances of this case fall within Justice Alito's exception to the majority's holding in Florence. Specifically, Plaintiffs contend that it is a violation of the Fourth Amendment to strip search a detainee charged with a non-indictable offense who has not appeared before a judge and who could have been held separately from the general population.[9]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons… against unreasonable searches and seizures."[10] U.S. Const. amend. IV. Nevertheless, pretrial detainees and convicted prisoners only have limited rights under the Fourth Amendment. See Bell v. Wolfish, 441 U.S. 520, 558 (1979) (inmates "retain some Fourth Amendment rights upon

---

[9] Plaintiffs seek to invoke the doctrine of constitutional avoidance, specifically arguing that this Court should only address Plaintiffs' New Jersey State law claims and avoid deciding their claim for violation of the Fourth Amendment. Under the avoidance doctrine, the Supreme Court has stated that "normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." Escambia County v. McMillan, 466 U.S. 48, 51 (1984); see Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). However, the doctrine has "little utility once a question has already been raised and answered." Chavez-Rivas v. Olsen, 207 F. Supp. 2d 326, 331 (D.N.J. 2002). Indeed, "common sense suggests that a question already recently settled need no longer be avoided, even if it remains somewhat controversial." Id. As discussed infra, courts in this circuit have already addressed whether, in light of Florence, a blanket policy of strip searching detainees charged with non-indictable offenses as part of the intake procedure is constitutional. Thus, this Court will not analyze Plaintiffs' state law claims first.

[10] "The Fourteenth Amendment extends Fourth Amendment protections to searches and seizures by state officials." Parkell v. Danberg, 833 F.3d 313, 324 n.6 (3d Cir. 2016).

commitment to a corrections facility….”); see also Parkell, 833 F.3d at 324 (stating “the contours of prisoners' Fourth Amendment rights… are very narrow.”).  In determining whether a particular policy is reasonable, courts must balance between an inmate's constitutional right to privacy and the needs of the institution to maintain safety and security.  See Florence, 566 U.S. at 326-27; see also Parkell, 833 F.3d at 326.  Specifically, “[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.”  Bell, 441 U.S. at 559.

In implementing strip search policies, correctional officers are afforded considerable deference, because “[t]he task of determining whether a policy is reasonably related to legitimate security interests is ‘peculiarly within the province and professional expertise of corrections officials.'”  Florence, 566 U.S. at 328 (quoting Bell, 441 U.S. at 548).  Indeed, “courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.”  Id. at 322-23.  A policy or “regulation impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests.”  Id. at 326 (internal quotation marks and citation omitted).

In Florence, the petitioner was arrested after a traffic stop for an outstanding bench warrant.  Id. at 323.  Seven years before that incident, the petitioner was arrested for fleeing from the police, and was charged with obstruction of justice and use of a deadly weapon.  Id.  The petitioner subsequently “entered a plea of guilty to two lesser offenses and was sentenced to pay a fine in monthly installments.”  Id.  At some point, the petitioner “fell behind on his payments and failed to appear at an enforcement hearing, [so] a bench warrant was issued for his arrest.”

Id.  Although he paid the balance of the fine before his arrest, "for some unexplained reason, the warrant remained in a statewide computer database."  Id.

After his arrest for an outstanding bench warrant, the petitioner was brought to the Burlington County Detention Center ("BCDC") where he was subjected to a strip search upon admission to jail.[11]  Id.  In particular, the petitioner claimed that he was required to lift his genitals, turn around, and cough while squatting.  Id.  After six days, the petitioner was moved to the Essex County Detention Center ("ECDC"), where "an officer looked at [his] ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits, and other body openings," including his genitals, upon entering the detention facility.  Id. at 324.  However, only one day after the transfer, the charges against the petitioner were dropped and he was released.  Id.  After his release, the petitioner filed suit against the governmental entities that operated the jail.

Before the Supreme Court, the petitioner argued that "there is little benefit to conducting these more invasive steps [such as requiring a detainee to lift their genitals or cough in a squatting position] on a new detainee who has not been arrested for a serious crime or for any offense involving a weapon or drugs."  Id. at 334.  Instead, the petitioner maintained that "these detainees should be exempt from this process unless they give officers a particular reason to suspect them of hiding contraband."  Id.  The Supreme Court disagreed and declared that

_____

[11] The Supreme Court noted that term "strip search" is often inexact:

> It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.

Id. at 325.

"[c]orrectional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in [to the jail] on their bodies. Facility personnel, other inmates, and the new detainee himself or herself may be in danger if these threats are introduced into the jail population." Id. at 322.

In maintaining safety in jail facilities, which often "can be even more dangerous than prisons because officials there know so little about the people they admit at the outset," the Supreme Court articulated three types of threats justifying a blanket strip search policy: (i) the danger of introducing health risks; (ii) increased gang activities within jails; and (iii) the prevention of contraband from entering the general population. Id. at 330-334, 336; see J.B. ex rel. Benjamin v. Fassnacht, 801 F.3d 336, 339 (3d Cir. 2015). Based on these threats, the Court declared that "[t]here is a substantial interest in preventing any new inmate… from putting all who live or work at these institutions at even greater risk when he is admitted to the general population." Florence, 566 U.S. at 333-34.

After deferring to the expertise of correctional officers, the Supreme Court concluded jails are not required to adopt a policy of exempting detainees charged with minor offenses from a routine, suspicionless strip search conducted during the intake procedure so long as the detainee is assigned to be housed in the general population at some point. Id. at 334-35. The Court concluded that the petitioner's view that detainees should be exempt from a strip search unless there is a reason to suspect the detainee of hiding contraband is "unworkable," since "[t]he record provides evidence that the seriousness of an offense is a poor predictor of who has contraband and that it would be difficult in practice to determine whether individual detainees fall within the proposed exemption." Id. at 334.

In light of the decision in <u>Florence</u>, the Third Circuit has reaffirmed that strip searches are reasonable when an inmate is assigned to be moved to the general population of a detention center. <u>See</u> <u>Fassnacht</u>, 801 F.3d at 341 ("Relying on the importance of deference to correctional officials, <u>Florence</u> permitted strip searches of all detainees admitted to the general population of a detention facility."); <u>see also</u> <u>Small v. Wetzel</u>, 528 Fed. Appx. 202, 207 (3d Cir. 2013) (stating that the "Court in <u>Florence</u> held that it is constitutional to conduct a full strip search of an individual detained in the general population of a jail, regardless of the reason for detention or the existence of reasonable suspicion that the individual is concealing something."). Indeed, so long as the search is done as a precaution before placing an inmate in the general population, the Third Circuit has held that "[r]outine, suspicionless inmate search policies may sweep quite broadly and still be reasonable." <u>Parkell</u>, 833 F.3d at 329 (citing <u>Florence</u>, 566 U.S. at 334).

In the instant matter, the facts are strikingly similar to the facts in <u>Florence</u>.[12] It is undisputed that, between November 2005 and December 2007, the Ocean County Jail implemented a policy and practice of conducting a strip search on all detainees charged with

_____

[12] In their briefing, Plaintiffs contend that the petitioner in <u>Florence</u> was arrested pursuant to a warrant for an indictable offense, as opposed to a warrant for a non-indictable offense. Plaintiffs are mistaken. The petitioner's warrant in <u>Florence</u> was issued based on his failure to pay a fine imposed as part of a plea deal in a criminal action and his failure to appear at an enforcement hearing. <u>Florence</u>, 566 U.S. at 323-34. In that regard, the Supreme Court noted that "[t]he District Court certified a class of individuals who were charged with a *nonindictable* offense under New Jersey law, processed at either the [BCDC] or [ECDC], and directed to strip naked even though an officer had not articulated any reasonable suspicion they were concealing contraband." <u>Id.</u> at 324-25 (emphasis added). Finally, in <u>Florence</u>, the petitioner specifically argued that persons arrested for a minor offense should not be subjected to a strip search as a routine part of the intake process, <u>id.</u> at 334, but the Court disagreed and held that all detainees – even for a minor offense – may be required to undergo a strip search upon entry to a detention center, <u>id.</u> at 339. Therefore, the petitioner in <u>Florence</u> was not arrested pursuant to a warrant for a more serious crime, but rather, he was arrested for minor offenses.

non-indictable offenses upon their entry to the Ocean County Jail. All of the Plaintiffs have testified that that they were required to remove their clothing, including their underwear, in front of a correctional officer for a close visual inspection during the intake process. Like the petitioner in <u>Florence</u>, Plaintiffs testified that they were required to manipulate their genitals while correctional officers inspected for any contraband or other threats to the safety and security of the facility. Once the strip search was completed, the officers provided prison uniforms and shoes to wear in the jail.

Critically, the parties do not dispute that all inmates that entered the Ocean County Jail, including Plaintiffs, were assigned to be moved to the general population, and that both Wedding and Bizzarro were actually placed in the general population at the Ocean County Jail. <u>See</u> Wedding Dep. at 29:2-22, 30:5-31:23; Bizzarro Dep. at 26:32:7-16, 28:3-8. Wedding was housed in the general population for two days, and Bizzarro spent approximately one week in the general population before he was released. <u>See id.</u> Although Wright made bail approximately twelve hours after his arrest, he was also waiting to be housed in the general population. <u>See</u> Wright Dep. at 20:22-21:8. Accordingly, based on the Supreme Court's holding in <u>Florence</u>, Defendants' policy and practice, in 2005 through 2007, of performing blanket, suspicionless strip searches of minor offenders that were assigned to the general population of the Ocean County Jail was constitutional, since the Supreme Court has previously found a legitimate penological interest in preventing contraband and other risks from infiltrating the general population, which outweighs Plaintiffs' constitutional rights to privacy under the Fourth Amendment.

Nevertheless, Plaintiffs contend that Justice Alito's concurrence in <u>Florence</u> establishes an exception that "precludes strip searches of *all* non-indictable detainees prior to their introduction in the general population," regardless of whether that individual was arrested

pursuant to a warrant. Pls.' Br. in Opp. at p. 11 (emphasis in original). While this argument appears to be directly at odds with the Court's holding in <u>Florence</u>, Plaintiffs clarify that Defendants' policy and practice of conducting a strip search as part of the intake procedure is a violation of the Fourth Amendment because, under Justice Alito's rationale, a detainee charged with non-indictable offenses cannot be strip searched until he or she is actually moved into the general population, which could take approximately 24 hours at the Ocean County Jail. Indeed, Plaintiffs contend that it makes sense to delay the strip searches of detainees who are not dangerous[13] and likely to be released prior to their introduction into the general population.

Before discussing Justice Alito's concurrence, the Court finds it helpful to examine Justice Kennedy's reservation of issues in the majority opinion, as well as Chief Justice Robert's concurrence emphasizing the narrowness of the majority's holding. Justice Kennedy, writing on behalf of the majority, stated that "[t]his case does not require [us] to rule on the types of searches that would be reasonable in instances where… a detainee will be held without assignment to the general population and without substantial contact with other detainees."[14]

---

[13] To the extent that Plaintiffs argue that correctional officers must have reasonable suspicion to strip search a detainee charged with a non-indictable offense, the Supreme Court clearly disagrees. In fact, the Court directly addressed that issue in <u>Florence</u>, holding that correctional officers have a significant interest in conducting routine, suspicionless searches of all detainees, including minor offenders. <u>See</u> <u>Florence</u>, 566 U.S. at 330, 334-35; <u>see also</u> <u>Parkell</u>, 833 F.3d at 329. Correctional officers are not required to consider the individual characteristics of a detainee before performing a strip search, nor are the officials required to articulate a particular suspicion that a detainee was attempting to smuggle contraband into the facility. <u>Id.</u> To be clear, under the Fourth Amendment, correctional officers at the Ocean County Jail were not required to establish reasonable suspicion before they performed strip searches on Plaintiffs.

[14] As an example, Justice Kennedy cited <u>Atwater v. Lago Vista</u>, 532 U.S. 318 (2001). <u>See</u> <u>Florence</u>, 566 U.S. at 338-39. In that case, the detainee was arrested for a misdemeanor seatbelt violation punishable only by a fine and, upon arriving at the local police station, the "[o]fficers took [the detainee's] 'mug shot' and placed her, alone, in a jail cell for about one hour, after

Florence, 566 U.S. at 338-39.  According to Justice Kennedy, when a detainee is not assigned to be placed in the general population, but is held separately from other detainees, "[t]he accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue."  Id. at 339.

In his concurrence, Chief Justice Roberts declared that "it is important for me that the Court does not foreclose the possibility of an exception to the rule it announces."  Id. at 340 (Roberts, C.J., concurring).  Because "[f]actual nuances have not played a significant role as this case has been presented," Chief Justice Roberts cautioned that "[t]he Court is nonetheless wise to leave open the possibility of exceptions, to ensure that we not embarrass the future."  Id. (internal quotation marks and citation omitted).  Similar to Justice Kennedy, Chief Justice Roberts pointed out that the lack of factual nuances "include the facts that Florence was detained not for a minor traffic offense but instead pursuant to a warrant for his arrest, and that there was apparently no alternative, if Florence were to be detained, to holding him in the general population."  Id.

In a separate concurrence, Justice Alito also emphasized the narrowness the majority's holding when he explained that "it is important to note… that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population."  Id. at 341 (Alito, J., concurring) (emphasis in original).  Justice Alito reasoned that "[m]ost of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate….  For these

---

which she was taken before a magistrate and released on $310 bond."  Atwater, 532 U.S. at 323-24.  That scenario is starkly different from the circumstances in this case, because Plaintiffs, here, were detained pursuant to warrants and they were assigned to be housed in the general population of the Ocean County Jail.

persons, admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible." Id. at 341-42. Justice Alito suggested, for example, that "some local jails appear to segregate temporary detainees who are minor offenders from the general population." Id. at 342.

Courts have struggled to decipher Justice Alito's concurrence and its impact on the majority's holding that correctional officers may require all detainees who are assigned to the general population to undergo a strip search. In line with Plaintiffs' argument, some courts in this circuit "have [] interpreted Florence as embracing an exception – albeit one whose precise contours are undefined at this point and time." Haas v. Burlington County, 955 F. Supp. 2d 334, 342-43 (D.N.J. 2013). However, other courts have expressed doubts whether Justice Alito actually created an exception. See Crump v. Passaic County, 147 F. Supp. 3d 249, 255-56 (D.N.J. 2015) ("Concurring, Justice Alito emphasized the limits of the Court's holding"); Moore v. Atlantic County, No. 07-5444, 2015 U.S. Dist. LEXIS 33160, at *26 (D.N.J. Mar. 18, 2015) (referring to Justice Alito's concurrence as the "so-called Florence 'exception'"); Conner v. Mastronardy, No. 13-3034, 2014 U.S. Dist. LEXIS 66854, at *9-10 (D.N.J. May 15, 2014) ("Justice Alito noted in his concurrence that the holding in Florence was limited" and was simply a "reservation of issues"). Indeed, Justice Alito stated that his concurrence only "emphasize[s] the limits of today's holding." Florence, 566 U.S. at 340 (Alito, J., concurring). While the Third Circuit has not directly addressed whether Justice Alito's concurrence created an exception to the majority's holding, the court advised that Justice Alito "emphasized the narrowness of the Court's holding" and left open the possibility that a blanket strip search policy may not always be constitutional. Parkell, 833 F.3d at 330 n.11; see Fassnacht, 801 F.3d at 341.

Based on the guidance provided by the Third Circuit and other courts in this district, as well as the plain language of Justice Alito's concurrence, it does not appear that Justice Alito created an exception to the majority's holding, but rather, he only highlighted the narrowness of the Court's decision in <u>Florence</u> and provided guidance on what may be considered an unconstitutional strip search procedure in the future. Nevertheless, even assuming that Justice Alito established an exception that includes persons arrested pursuant to a warrant, this Court concludes that each of the Plaintiffs' circumstances do not fall within such an exception, since Plaintiffs have failed to establish that the Ocean County Jail had an alternative housing solution for detainees with non-indictable offenses between November 28, 2005 and December 28, 2007.[15]

Justice Alito set forth a two-prong inquiry requiring a plaintiff to show: (i) that the detainee's detention was not reviewed by a judicial officer; <u>and</u> (ii) that the detainee could be held in available facilities apart from the general population. <u>Florence</u>, 566 U.S. at 341-42 (Alito, J., concurring); <u>see</u> <u>Moore</u>, 2015 U.S. Dist. LEXIS 33160, at *26.

---

[15] Both Chief Justice Roberts and Justice Kennedy state that the limitation of the Court's holding is reserved for detainees who were arrested without a warrant, as opposed to the petitioner in <u>Florence</u>, who was arrested pursuant to an outstanding bench warrant. <u>See</u> <u>Florence</u>, 566 U.S. at 338-39; <u>id.</u> at 340 (Roberts, C.J., concurring). With respect to the first prong of his concurrence, Justice Alito did not expressly address whether his analysis was limited to warrantless arrests, or whether he intended to include persons arrested pursuant to a warrant for a non-indictable offense. <u>See</u> <u>Haas</u>, 955 F. Supp. 2d at 344. Instead, "[h]e simply and ambiguously (intentionally or not) refers to 'an arrestee whose detention has not been reviewed by a judicial officer.'" <u>Id.</u> (quoting <u>Florence</u>, 566 U.S. at 341). Based on that ambiguity, Plaintiffs argue that Justice Alito intended to include detainees charged with non-indictable offenses, and that he also required that these detainees be strip searched only after they were subject to post-arrest review by a judicial officer, such as an initial appearance or hearing. However, the Court need not address those issues, because Plaintiffs cannot satisfy the second prong of Justice Alito's "exception," <u>i.e.</u>, that the detainee could be held in available facilities separate from the general population.

With respect to the second prong, I find the decision in <u>Moore</u> to be instructive.[16]  In that case, the plaintiffs initiated a putative class action lawsuit against the Atlantic County Correctional Facility (the "ACCF") for violation of their Fourth Amendment rights based on the ACCF's policy and practice of subjecting detainees charged with non-indictable offenses, such as the failure to make child support payments, to strip searches as part of the intake process. <u>Moore</u>, 2015 U.S. Dist. LEXIS 33160, at *2-4.  There, the plaintiffs testified that, after arriving at the ACCF, correctional officers instructed each of the plaintiffs to remove their clothes, lift their genitals and spread their butt cheeks while an officer used a flashlight to search for contraband.  <u>Id.</u> at *3-4.  Like the Plaintiffs in this case, the plaintiffs in <u>Moore</u> argued that "the circumstances of [their] case fall under an exception to the <u>Florence</u> holding," and that the ACCF violated their constitutional rights by performing the strip search before their actual introduction into the general population.  <u>Id.</u> at *18-20.

---

[16] Plaintiffs argue that <u>Moore</u> is factually inapposite and incorrectly decided.  Specifically, Plaintiffs contend that the plaintiffs in <u>Moore</u> were subjected to "cavity searches," not strip searches like the petitioner in <u>Florence</u>.  In <u>Moore</u>, the plaintiffs similarly argued that it was the defendant's policy to conduct "cavity searches," as defined by the New Jersey Strip Search Statute, but the court concluded that, "[w]hile the type of search at issue may be considered a 'cavity search' under the New Jersey Strip Search Statute, it is virtually identical to the type of search considered by the Supreme Court in <u>Florence</u>."  <u>Moore</u>, 2015 U.S. Dist. LEXIS 33160, at *20 n.9.  Here, both the searches in <u>Florence</u> and <u>Moore</u> are nearly identical to the searches in this matter, and as such, I am not persuaded by Plaintiffs' argument.

Next, Plaintiffs contend that <u>Moore</u> is distinguishable because the plaintiffs, and almost all other detainees at the Atlantic County Correctional Facility, consented to being strip searched. However, the plaintiffs in <u>Moore</u> specifically argued that the detention center's policy was a "pretext" for a blanket policy of searching all detainees "regardless of whether consent was obtained."  <u>Id.</u> at *23-24.  As a result, one of the issues before the court was whether a *de facto* blanket policy allowing all detainees charged with non-indictable offenses to undergo strip searches, absent reasonable suspicion that the detainee had weapons or other contraband, is constitutional under the Fourth Amendment.  <u>Id.</u> at *25-26.  The court in <u>Moore</u> found that such a policy was, in fact, constitutional.  <u>Id.</u>

In granting the ACCF's motion for summary judgment, and denying the plaintiffs' cross-motion for summary judgment, the court reasoned that <u>Florence</u> "held that an institution's policy of subjecting every incoming detainee who would enter into the general population to a strip search, regardless of whether there was reasonable suspicion that the detainee may be in possession of contraband, drugs, or weapons, did not violate the Fourth Amendment to the United States Constitution." <u>Id.</u> at *19-20. Because the record did not contain any evidence that the ACCF's strip search policies were an unnecessary or unjustified response to the problem of contraband and other threats being introduced to the general population, the court concluded that "the holding in <u>Florence</u> clearly allows for such policies under the circumstances as they exist in this case." <u>Id.</u> at *25-26.

In addition, the court held that "the so-called <u>Florence</u> 'exception' cannot save Plaintiffs' claim." <u>Id.</u> at 26. The court reasoned that "[t]he exception may exist if two circumstances are true: the arrestee's detention has not yet been reviewed by a judicial officer, *and* the arrestee can be held apart from the general population." <u>Id.</u> (emphasis in original). Solely addressing whether the plaintiffs could have been held separately from the general population, the court found that all non-indictable detainees, including the plaintiffs, were assigned to the general population, and that the parties did not dispute that the ACCF lacked the capacity to hold non-indictable detainees in facilities removed from the general populations. <u>Id.</u> at *26-28; <u>see</u> <u>Collazo v. Cnty. of Lancaster</u>, No. 10-7010, 2012 U.S. Dist. LEXIS 124586, at *20-21 (E.D. Pa. Aug. 31, 2012) (concluding that "the possible exception" alluded to by Justice Alito did not apply because the plaintiff provided "no evidence regarding the availability of alternative facilities removed from Lancaster County Prison's general population.").

In the instant matter, it is undisputed that Plaintiffs were all assigned to be housed in the general population at the Ocean County Jail, and Defendants have established that, between November 2005 and December 2007, Plaintiffs and other detainees charged with non-indictable offenses could not have been held in facilities apart from the general population based on overcrowding.  See Declaration of Mary J. Lidaka, Esq. ("Lidaka Decl."), Ex. A, Certification of Sandra Miller ("Miller Cert.") at ¶¶ 1-4.  In her certification, Miller stated that she served as the Chief of Administrative Services at the Ocean County Jail for 31 years, and that, "during the relevant time period... the inmate population at the jail routinely exceeded its maximum capacity."  Id. at ¶¶ 2-3.  Miller further stated that, based on overcrowding issues, the Ocean County Jail "did not have the facilities to segregate indictable from non-indictable detainees or inmates."  Id. at ¶ 4.  Plaintiffs have not presented any evidence to the contrary.  Indeed, Plaintiffs have not presented any evidence that Defendants had the ability to segregate Plaintiffs, who were held on non-indictable offenses, in an alternative facility removed from the general population at the Ocean County Jail.  Rather, the evidence in the record reflects that all detainees that entered the Ocean County Jail were assigned to be placed in the general population, and that, once the correctional officers medically examined and classified the detainee, he or she was then moved into the general population.

Moreover, with respect to the timing of the strip searches, Plaintiffs contend that Justice Alito cited the Ninth Circuit's decision in Bull v. City and County of San Francisco, 595 F.3d 964 (9th Cir. 2010) for the proposition that detainees charged with minor offense should not be strip searched until they are actually introduced into the general population, which, in this case, could take up to 24 hours.  According to Plaintiffs, any detainee that was strip searched before he or she was actually introduced into the general population, or was strip searched and then

released, has a viable claim under the Fourth Amendment.[17]  However, Plaintiffs' argument is misplaced, because it is clear that Justice Alito simply cites to Bull as an example of a local jail that "segregate[s] temporary detainees who are minor offenders from the general population." Florence, 566 U.S. at 342 (Alito, J., concurring).  Furthermore, Bull does not stand for the proposition that correctional officers are specifically prohibited from strip searching detainees charged with minor offenses until immediately before they enter the general population.

In Bull, the Ninth Circuit held that the implementation of a policy requiring the strip search of all detainees who are to be introduced into the general population did not violate the plaintiffs' constitutional rights under the Fourth Amendment.  Bull, 595 F.3d at 966.  Pursuant to San Francisco's policy, detainees were initially brought to a temporary intake and release facility and, if the detainee could not make bail or otherwise be released, he or she was transferred to a custodial housing facility where the general population was located.  Id. at 968.  Once the detainee arrived at that facility, they "were strip searched prior to admission into the general population in order to prevent the smuggling of contraband into the facilities."  Id.  Contrary to Plaintiffs' argument, the Ninth Circuit in Bull only addressed the strip search policy at issue there, i.e., a policy of strip searching detainees after they were transferred from San Francisco's temporary intake and release facility to the custodial housing facility.  The court in Bull was not

---

[17] Plaintiffs even suggest that a strip search of a detainee charged with non-indictable offenses cannot be performed until *after* that person is transferred into the general population. This interpretation of Justice Alito's concurrence is completely at odds with the Supreme Court's conclusion that correctional officers have a legitimate interest in detecting and preventing contraband from entering the general population and "putting all who live or work at these institutions at even greater risk" of harm.  Florence, 566 U.S. at 333-34.  Indeed, common sense dictates that, in order to prevent weapons and other contraband from entering the general population of a detention center, strip searches must be conducted *before* the detainee actually enters the general population.

confronted with the issue whether it would be constitutional (or, unconstitutional) for a detention center, which is incapable of segregating temporary detainees who are minor offenders from the general population, to adopt a policy that allows for strip searches to be performed as part of the initial intake procedure. Because the circumstances in <u>Bull</u> are different than the circumstances in <u>Florence</u> and the instant matter, <u>Bull</u> is not helpful to Plaintiffs' position.

Moreover, neither Justice Kennedy in the majority opinion, nor Justice Alito in his concurrence, suggest that correctional officers must perform strip searches immediately before an inmate is admitted to the general population. To the contrary, the petitioner in <u>Florence</u> was strip searched upon admission to the BCDC and ECDC, and the Court specifically held that correctional officers are allowed to conduct a thorough strip search as part of the intake process. <u>Florence</u>, 566 U.S. at 330, 339. Additionally, the focus of Justice Alito's concurrence is not on the constitutionally of a strip search that was performed immediately before a detainee entered the general population, but rather, Justice Alito was concerned with whether a strip search was necessary when a detention center, for example, has the capacity to house detainees charged with non-indictable offenses separate and apart from the general population. In that regard, it is clear that the fact that some detainees, including Wright, may have been released before they entered into the general population does not place Plaintiffs within the so-called <u>Florence</u> exception, because, even if they never actually made it into the general population, the Ocean County Jail could not have housed them separately. <u>See</u> <u>Moore</u>, 2015 U.S. Dist. LEXIS 33160, at *26-28.

Finally, although Plaintiffs contend that detainees charged with non-indictable offenses are often not dangerous and should not be strip searched before they actually enter the general population, the Court in <u>Florence</u> disposes of Plaintiffs' argument, stating that "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals." <u>Florence</u>, 566

U.S. at 334.  Indeed, "[t]hese inmates, who might be thought to pose the least risk, have been

caught smuggling prohibited items into jail," and that contraband can easily be concealed "as an

officer approaches a suspect's car or during a brief commotion in a group holding cell." Id. at

333.  Indeed, as explained by the court in Moore, "[t]he entire reason for conducting a search is

to do so *before* a detainee would be admitted to his or her final housing location... otherwise the

risks necessitating the strip search in the first place cannot be abated." Moore, 2015 U.S. Dist.

LEXIS 33160, at *27 (emphasis in original)

    Accordingly, based on the Supreme Court's decision in Florence, this Court concludes

that Defendants' policy and practice of performing strip searches on all detainees, who were

detained pursuant to warrants, including detainees charged with non-indictable offenses, is

constitutional under the Fourth Amendment and, assuming that Justice Alito created an

exception to the majority's holding, Plaintiffs' claims still fail because they have not presented

any evidence that the Ocean County Jail could have held Plaintiffs, and all other detainees

charged with minor offenses, in a facility separate and apart from the general population.

**B.**    **State Law Claims**

    Plaintiffs assert two state law claims.  In Count One, Plaintiffs assert a NJCRA claim for

violation of the New Jersey Constitution, which is identical to Plaintiffs' claim for violation of

the Fourth Amendment.  In Count Two, Plaintiffs assert a NJCRA claim for violation of the New

Jersey Strip Search Statute.  According to Plaintiffs, the New Jersey Legislature delegated

authority to the New Jersey Attorney General to establish guidelines for strip searches in

detention centers, and the Attorney General required that, in order to strip search detainees

charged with non-indictable offenses, a correctional officer must possess either: (i) a search

warrant; (ii) voluntary consent; or (iii) reasonable suspicion that the detainee is concealing a

weapon or other contraband. Plaintiffs maintain that Defendants did not satisfy any of those procedural safeguards before strip searching Plaintiffs.

Under 28 U.S.C.S. § 1367, a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C.S. § 1367(c)(3). The Third Circuit has recognized that, when all federal claims are disposed of on a motion for summary judgment, "the district court must decline to decide the pendent state claims" unless extraordinary circumstances exist. Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995); see Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976) (stating that "court[s] should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances."); Simmerman v. Corino, 804 F. Supp. 644, 658 (D.N.J. 1992) ("[W]here a party's federal claims are disposed of on a summary judgment motion, the court should generally refrain from exercising supplemental jurisdiction over the remaining state claims."), aff'd, 16 F.3d 405 (3d Cir. 1993).

In the instant matter, the Court is cognizant that this matter was stayed for several years during the appeals process in Florence, but the Court declines to exercise its discretion to retain supplemental jurisdiction over Plaintiffs' state law claims.[18] See Moore, 2015 U.S. Dist. LEXIS 33160, at *28-29 (declining to exercise pendent jurisdiction over the plaintiffs' state law claims for violations of the New Jersey constitution and the New Jersey Strip Search Act). Because the parties have already engaged in discovery, they will not be required to expend additional time

---

[18] Plaintiffs do not argue, nor do they plead in their Fourth Amended Complaint, that this Court has independent jurisdiction over their state law claims under the Class Action Fairness Act ("CAFA"), see 28 U.S.C. § 1332(d)(2) (stating that, to establish jurisdiction under CAFA, plaintiffs must satisfy the minimal diversity requirements and allege damages that exceed $5,000,000). Instead, Plaintiffs only assert that this Court has supplemental jurisdiction over their state law claims, pursuant to 28 U.S.C. § 1367.

and resources in that regard.  In addition, although the parties will have to argue the state law claims before the state court, the Court finds that it is best left to the state court to decide the remaining state law claims.  Accordingly, Plaintiffs' state law claims in Counts One and Two are dismissed without prejudice, the appropriate statutes of limitations are tolled, and Plaintiffs are directed to file their state law claims in the New Jersey state court within thirty (30) days, pursuant to 28 U.S.C. § 1367.

## IV.     CONCLUSION

For the reasons set forth above, Plaintiffs' cross-motion to appoint is **GRANTED**, and Carl Poplar is hereby approved as co-class counsel *nunc pro tunc* to November 6, 2013. Furthermore, Defendants' motion is **GRANTED**.  Plaintiffs' Fourth Amendment claim in Count One is hereby dismissed, and this Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims in Counts One and Two.  Thus, those claims are dismissed without prejudice and the applicable statutes of limitations are tolled; Plaintiffs may re-file their state law claims in State court within thirty (30) days from the date of the Order accompanying this Opinion.  See 28 U.S.C.S. § 1367(c)-(d).


DATE: May 16, 2017                               /s/ Freda L. Wolfson
                                                 The Honorable Freda L. Wolfson
                                                 United States District Judge